# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-3318

ROBERT WESTEFER,
MARK VONPERBANDT,
ALLEJANDRO VILLAZANA, et al.,

*Plaintiffs-Appellants,*

*v.*

DONALD SNYDER,
ODIE WASHINGTON,
MICHAEL V. NEAL, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00 C 162—**G. Patrick Murphy**, *Chief Judge.*

_____

ARGUED SEPTEMBER 29, 2004—DECIDED SEPTEMBER 6, 2005

_____

Before CUDAHY, RIPPLE and EVANS, *Circuit Judges*.

RIPPLE, *Circuit Judge.* The plaintiffs, prisoners incarcerated at Tamms Correctional Center ("Tamms") in Illinois, brought this § 1983 action against officers and employees of the Illinois Department of Corrections (collectively, "IDOC"). The prisoners alleged that their transfers to Tamms violated their rights to due process of law and

freedom of association and against ex post facto punishment. The district court dismissed these counts for failure to state a claim. Another count, alleging that the transfer constituted retaliation for the exercise of First Amendment rights, survived this initial scrutiny. The parties then conducted discovery on this remaining count. Following discovery, the district court granted summary judgment to IDOC. The prisoners appeal the decision of the district court with respect to all of these claims. After oral argument, we ordered the parties to file supplemental briefs addressing the administrative process by which an inmate, already incarcerated at Tamms, can challenge his assignment to that facility. After the Supreme Court decided *Wilkinson v. Austin*, 125 S. Ct. 2384 (2005), the parties filed supplemental briefs addressing the applicability of that decision to this case. For the reasons set forth in the following opinion, we affirm the judgment of the district court with respect to the freedom of association and ex post facto claims. With respect to the retaliation and due process claims, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

Tamms is the highest security prison in Illinois. IDOC designed the conditions there to be harsh, so that the threat of being transferred to Tamms would deter prisoners throughout the system from disobeying prison rules. According to IDOC, all Tamms prisoners are exposed to hardships that are not experienced in segregated confine-

ment at any other maximum security facility in Illinois.[1] IDOC transferred the plaintiffs to Tamms within a year after it opened.

The plaintiffs[2] are organized into two categories, labeled generally the "litigation plaintiffs" and the "gang plaintiffs." The gang plaintiffs, some of whom are also litigation plaintiffs, are associated with prison gangs (in IDOC terminology, "Security Threat Groups" or "STGs"). The gang plaintiffs claim that IDOC encouraged their gang activity before 1996, but then changed policies and now transfers gang leaders to Tamms for no reason but their gang affiliation. The litigation plaintiffs submit that IDOC has a policy of transferring inmates with a history of filing actions, grievances or other complaints about IDOC and prison conditions. They claim that IDOC has a policy of transferring prisoners with litigation histories to Tamms as a means of retaliating for the trouble they cause the department through their litigation activities. Each of these prisoners asserts that his disciplinary history does not warrant an assignment to Tamms.

---

[1] In their initial complaint, the plaintiffs described the purpose of Tamms and the harshness of confinement conditions there. In this appeal, IDOC has accepted the descriptions as true.

[2] Of the thirty-three captioned appellants in this case, Mr. Carroll has been dismissed by his own request and Mr. Chapman committed suicide in August 2004. Of the remaining defendants, it appears that several have been released from IDOC's custody or no longer are at Tamms. To the extent that the appellants no longer are in custody or are incarcerated at Tamms, they lack standing to request injunctive relief from their assignment to Tamms.

### B.  District Court Proceedings

In a four-count § 1983 complaint, only three counts of which are now before this court, the gang plaintiffs alleged violations of the First Amendment right of association and of the right to be free from ex post facto punishment. The litigation plaintiffs sought money damages and injunctive relief for retaliatory interference with their First Amendment right to petition the courts. All prisoners asserted violations of their right to due process.

The district court conducted a preliminary screening of the prisoners' complaints. *See* 28 U.S.C. § 1915A. This review resulted in the dismissal for failure to state a claim of the due process claim of all the prisoners as well as the associational rights claim and the ex post facto claim of the gang plaintiffs.

With respect to the retaliation claim, the district court held that the litigation plaintiffs met the threshold requirements of § 1915A because retaliation for exercising one's right to access to the courts is a cognizable constitutional claim, and the prisoners had pleaded sufficiently such a claim. However, the district court struck, as a discovery sanction, a good deal of the evidence submitted by the prisoners on the issue of retaliation. Subsequently, it granted the state officials summary judgment on the retaliation claim.

A more detailed rendition of the district court's rationale is set forth in our discussion of each claim on appeal.

**II**

## DISCUSSION

### A. The Gang Plaintiffs' Claims

The gang plaintiffs asserted that their transfer to Tamms, on account of gang membership, violated their First Amendment right to freedom of association and the Ex Post Facto Clause. The district court rejected the associational rights claim on the grounds that the prisoners had no First Amendment right to belong to a gang and that regulating gang activity served legitimate penological goals. The court rejected the ex post facto argument because the change in prison conditions constituted a reasonable regulation and not additional punishment. Therefore, reasoned the district court, even if IDOC transferred them to Tamms in retaliation for their gang activities, the gang plaintiffs had no cognizable claim.

We review these § 1915A dismissals de novo. *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). In undertaking such a review, we must construe all allegations as true and in the light most favorable to the prisoners. *Id.*

### 1. Freedom of Association

The gang plaintiffs submit that IDOC's policy of transferring STG members to Tamms violates their First Amendment right of association. They allege that IDOC's policy prior to 1996 encouraged gang membership; current policy, by contrast, restricts prisoners' rights to associate with prison gangs.[3] The gang plaintiffs challenge IDOC's regulations that allow officials to transfer prisoners who are gang

---

[3] At oral argument, IDOC admitted that prisons in the system had a pre-1996 practice of cooperating with prison gangs to maintain order in the facilities.

members or "who may be planning to engage" in gang activity, Ill. Admin. Code tit. 20, § 505.40(b), as unconstitutionally overbroad.

IDOC contends that the prisoners' transfers to Tamms implicate neither expressive nor intimate rights to association. In its view, regardless of whether IDOC once had a policy of cooperating with prison gangs, prisoners have no First Amendment right to associate with gangs.

We agree with IDOC on this point. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). "When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez*, 416 U.S. 396, 405-06 (1974). Although we have not so held expressly, we have opined that "gang membership seems not to implicate the right of association." *Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ.*, 251 F.3d 662, 667 (7th Cir. 2001) (citing *City of Chicago v. Morales*, 527 U.S. 41 (1999)). *But cf. Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir. 1997) (assuming protection but holding no constitutional error in admitting evidence of membership in a gang that had committed brutal acts, as evidence of future dangerousness, with citation to *Dawson v. Delaware*, 503 U.S. 159 (1992)).

We see no basis for maintaining that those who have been incarcerated as a result of a criminal conviction and consequently deprived of some of the most basic of associational opportunities during their imprisonment somehow retain the *right* to belong to a gang within the prison walls when prison officials have determined that such a group is detrimental to the achievement of the prison's legitimate penological goals. The decision of prison administrators as

to the detrimental effect of such groups is a decision to which we owe great deference. *See Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 132 (1977). Moreover, just recently, the Supreme Court spelled out, in no uncertain terms, the incompatibility of prison gangs with any penological system:

> Prison security, imperiled by the brutal reality of prison gangs, provides the backdrop of the State's interest. Clandestine, organized, fueled by race-based hostility, and committed to fear and violence as a means of disciplining their own members and their rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls. See Brief for State of California et al. as *Amici Curiae* 6. Murder of an inmate, a guard, or one of their family members on the outside is a common form of gang discipline and control, as well as a condition for membership in some gangs. See, *e.g., United States v. Santiago,* 46 F.3d 885, 888 (C.A.9 1995); *United States v. Silverstein,* 732 F.2d 1338, 1341 (C.A.7 1984). Testifying against, or otherwise informing on, gang activities can invite one's own death sentence. It is worth noting in this regard that for prison gang members serving life sentences, some without the possibility of parole, the deterrent effects of ordinary criminal punishment may be substantially diminished. See *id.,* at 1343 ("[T]o many inmates of Marion's Control Unit [a federal Supermax facility,] the price of murder must not be high and to some it must be close to zero").

*Wilkinson,* 125 S. Ct. at 2396-97.

Although, in the past, some prison officials in Illinois apparently intentionally abdicated their authority to prison gang leaders, this inexplicable deviation certainly does not

cast doubt on the reality that prison gangs are a manifest threat to prison order and discipline and that there is no federal constitutional impediment to their ban by prison officials. We thus agree with the district court that the gang plaintiffs' contention that they have a right grounded in the First Amendment to belong to a prison gang is simply too tenuous to state a claim. *See Jones*, 433 U.S. at 126-29; *Rios v. Lane*, 812 F.2d 1032, 1036 (7th Cir. 1987).

### 2. Ex Post Facto

The gang plaintiffs further submit that the district court erred in dismissing their § 1983 complaint because IDOC's policy of transferring them to Tamms violates the Ex Post Facto Clause of the Constitution. They base their argument on IDOC's pre-1996 policy of cooperating with prison gangs. According to the prisoners, IDOC's policy shift from encouraging gang membership to transferring gang members to Tamms once the facility opened, constitutes ex post facto punishment of previously allowed activity.[4]

The Ex Post Facto Clause forbids a legislature from passing laws retroactively altering the elements of or increasing the punishment for a crime. *California Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995). For ex post facto purposes, therefore, we must address whether (1) the action complained of constitutes a "law," and (2) the sanction can be considered a "punishment." *Id.*

---

[4] In the alternative, the prisoners argue that the change in IDOC's policy violates their due process rights because they were not given fair warning that gang membership would give rise to additional criminal penalties. We discuss this alternative argument in the due process discussion *infra*.

On the first inquiry, we generally have limited ex post facto consideration to legislative acts, and have not extended the definition to interpretations of law made by administrative agencies. *See Prater v. U.S. Parole Comm'n*, 802 F.2d 948 (7th Cir. 1986) (en banc). Under Illinois law, IDOC has the discretionary authority to assign prisoners to any facility in its system, 730 ILCS § 5/5-8-6(a), and we cannot say that the exercise of this discretionary authority constitutes a "law" for ex post facto purposes.

The prisoners also fail the second inquiry. "As *Collins* [*v. Youngblood*, 497 U.S. 37 (1990)] and subsequent cases make clear, the *Ex Post Facto* Clause does not prohibit every alteration in a prisoner's confinement that may work to his disadvantage." *Gilbert v. Peters*, 55 F.3d 237, 238 (7th Cir. 1995). "Punishment" for ex post facto analysis concerns the length of imprisonment, not the conditions of imprisonment. *Garner v. Jones*, 529 U.S. 244, 250 (2000); *United States v. Shorty*, 159 F.3d 312, 317 (7th Cir. 1998). We have noted that a significant factor to consider in determining whether a law is punitive is the statute's purpose. *Gilbert*, 55 F.3d at 238. Although a transfer to Tamms constitutes a change in the conditions of confinement for a duly-convicted prisoner, it cannot be characterized as an increase in the punishment for the crime of conviction, but rather is a response to legitimate security concerns and forwards valid penological interests. *See Morales*, 514 U.S. at 510.

The district court correctly dismissed the gang plaintiffs' ex post facto claims.

## B. The Litigation Plaintiffs' Claims

The litigation plaintiffs alleged that they had been sent to Tamms in retaliation for filing lawsuits against IDOC and its officials. The district court determined that several of the

prisoners—Mr. Felton, Mr. Horton, Mr. V. Rodriguez and Mr. Santiago—had failed to exhaust their administrative remedies. It therefore dismissed the suits of these prisoners without prejudice.

IDOC moved for summary judgment. At the same time, they moved to strike certain evidence offered by the prisoners in response, under Federal Rule of Civil Procedure 37(c)(1). The evidence consisted of affidavits indicating that information in the prisoners' placement forms[5] was false. The IDOC officials admitted relying upon these forms in making their transfer decisions. IDOC predicated its motion to strike on the assertion that the prisoners had presented this evidence but had failed to amend answers to previously-served IDOC interrogatories as required by Federal Rule of Civil Procedure 26.

The district court granted both the motion to strike and the motion for summary judgment. On the motion to strike, the substance of which is considered in greater detail below, the court determined that the prisoners had insufficient justification for failing to amend their answers to IDOC interrogatories. The district court therefore did not consider, when deciding the summary judgment motion, the prisoners' claim that IDOC had placed them at Tamms based on falsified placement forms.[6]

---

[5] Placement forms summarize personal information about the prisoner, including their segregation status and the STG affiliation or general disciplinary problems justifying their transfer to Tamms.

[6] The district court also determined that the prisoners failed to disclose facts supporting their claim against Mr. Snyder as requested in the interrogatories. As a result, the court dismissed
(continued...)

On the merits of the summary judgment motion,[7] the district court noted that, in order to prevail on their retaliation claim, the prisoners had to demonstrate that their conduct was constitutionally protected and that this conduct (the litigation previously filed by the prisoners) constituted a substantial or motivating factor in IDOC's decision to transfer them to Tamms. Each prisoner presented a chronology of events that allegedly demonstrated that their filing of a previous lawsuit had motivated IDOC's transfer decision. With the sole exception of Mr. Clayton,[8] the district court determined that the prisoners' chronologies had failed to connect their transfers to their previous litigation activity. Because these prisoners had not offered any additional evidence, the court determined that they had not met their burden. The court further opined that the same result would obtain for Mr. Felton and Mr. Horton, had their cases not been dismissed for failure to exhaust.

The prisoners now appeal the district court's § 1915A

---

[6] (...continued)
Mr. Snyder as a defendant.

[7] The court also treated the motion for summary judgment as a motion by all of the officials—including some defendants who had not filed motions—because the Illinois Attorney General represented all of the defendants.

[8] As for Mr. Clayton, the district court noted that he had presented some evidence of a direct threat, made by one of the officials named as defendants, to send him to Tamms because of his grievances and lawsuits. However, because an official other than the one who had allegedly threatened Mr. Clayton approved his transfer, the district court determined that Mr. Clayton had failed to connect his activities with his transfer. Therefore, with respect to each of the prisoners, the district court granted summary judgment in favor of the prison officials.

ruling based on exhaustion as well as its grant of IDOC's motions to strike and for summary judgment.

### 1. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") prohibits prisoners from filing suit with respect to prison conditions unless all available administrative remedies have been exhausted. 42 U.S.C. § 1997e(a). The parties agree that this action is subject to the PLRA's exhaustion requirement. Although exhaustion is a precondition to the prisoners' suit, failure to exhaust is an affirmative defense that IDOC has the burden of proving. *See Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004). IDOC claims that several of the prisoners failed to exhaust their administrative remedies and are precluded from bringing this suit.

Our consideration of this question requires that we ascertain the administrative procedures by which a prisoner may challenge his transfer to Tamms. Because the record and the initial briefing did not present a clear picture, we requested that the parties file supplemental briefs addressing the administrative procedures available to a Tamms prisoner. Upon review of these submissions, we must conclude that IDOC has not carried its burden of establishing that the prisoners failed to exhaust available administrative remedies.

IDOC submits that inmates have two avenues through which they must challenge their transfers to Tamms: through the transfer review hearing process and the inmate grievance process. Illinois regulations establish two types of transfer hearings at Tamms, depending on the inmate's segregation category upon arrival at the facility. Prisoners are classified as subject to either administrative or disciplin-

ary segregation, and different review processes govern each category.

Inmates who are in administrative detention when they arrive are afforded a transfer review hearing within ten working days ("whenever possible") of their transfer to Tamms. Ill. Admin. Code tit. 20, § 505.60(a). This hearing includes the opportunity for an inmate to appear, make statements challenging his placement, submit documentary evidence and request that the transfer review committee interview other persons. *Id.* § 505.60(b). The committee then makes a recommendation to the Chief Administrative Officer ("CAO," i.e., the warden), who approves or denies the recommendation before forwarding it to the Assistant Deputy Director. *Id.* § 505.60(d).[9] Presumably, those plaintiffs who were sent to Tamms in administrative detention status received this initial transfer review hearing, although, for reasons discussed below, the record is silent in that respect.

Inmates who are transferred to Tamms in disciplinary segregation status are *not* afforded an initial transfer review hearing; regulations provide only that such individuals receive a hearing after their term of disciplinary segregation ends. *Id.* § 505.60(a). This provision must prove problematic for some inmates. If a prisoner is sent to Tamms in a disciplinary segregation status that does not expire for a very long time, he will not have a hearing on his transfer to Tamms until the expiration of that very long disciplinary sentence.

---

[9]  IDOC notes that its policy has changed from that contained in the regulations and that the recommendation goes from the CAO to the Deputy Director, who apparently approves a transfer if warranted.

Apart from the initial transfer review hearing, the review committee conducts a review of each prisoner's file every ninety days to determine whether placement at Tamms is still appropriate. *Id.* § 505.70(a). The ninety-day review does not afford the inmate an opportunity to be heard or to present evidence. In addition, although IDOC represents that the ninety-day review is conducted for every Tamms inmate, *see* Appellees' Supplemental Br. at 4 n.4, the regulation indicates that such quarterly review only applies to those in administrative detention, *see* Ill. Admin. Code tit. 20, § 505.70(a) (noting that the committee "review[s] the record of each committed person in administrative detention").

For individuals in administrative detention, the transfer review committee conducts an additional hearing every year in which the inmate has the same opportunity to be heard and to present evidence challenging his transfer as in the initial hearing, and is also entitled to notice of the committee's finding. *Id.* § 505.70(b) (stating that the annual hearing is to be held in accordance with the standards of the initial review). Again, the individuals in administrative detention that have been at Tamms for more than a year have presumably been afforded such annual reviews, while those in disciplinary detention status presumably have not.

We say "presumably" with respect to the administrative review hearings because it appears that IDOC has not provided the prisoners with the hearing records, which they requested early in this litigation. Nevertheless, without evidence to the contrary, we presume that Tamms officials follow Illinois regulations, in which case every prisoner transferred in administrative detention has been afforded a

review hearing.[10] Prisoners who were transferred in, and remain in, disciplinary segregation have not yet qualified for a review hearing, and this administrative remedy is unavailable to them. *See Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002).

IDOC's position that the transfer review process affords an administrative remedy is unconvincing for another reason. Many of the prisoners contend that they were not told the reasons for their transfer to Tamms; indeed, several prisoners filed grievances to complain about this problem. IDOC regulations do not require the department to notify prisoners why they have been transferred. We doubt whether the transfer review process is effective for prisoners who do not know the grounds for their transfer and who thus have no basis with which to contest their transfer. More importantly, if a prisoner discovers the reasons for his transfer shortly after completing the initial transfer review hearing and wishes to contest the transfer because, for instance, the reasons are based on incorrect facts, he must wait at least one more year before he can present evidence at his annual review hearing. For all these reasons, with respect to the transfer review process, IDOC has not carried its burden of establishing that the prisoners have not satisfied PLRA exhaustion requirements.

---

[10] IDOC does not argue that the prisoners have failed to exhaust administrative remedies because an annual status review is available to those in administrative detention status. Nor do they argue that the ultimate availability of a transfer hearing to those in disciplinary segregation—available, that is, after their period of disciplinary segregation ends—means that such prisoners have also failed to exhaust available remedies.

IDOC also submits that the inmate grievance process is another avenue for challenging transfer to Tamms. Although we have considered, in previous cases, IDOC's grievance process in challenging general prison conditions, we have not addressed whether the grievance process is an administrative remedy by which a prisoner may challenge his transfer to Tamms. In Illinois, "incidents, problems, or complaints" may be grieved, Ill. Admin. Code tit. 20, § 504.810(a), but the grievance process cannot be "utilized for complaints regarding decisions that are outside the authority of the Department, such as parole decisions, clemency, or orders regarding length of sentence or decisions that have been rendered by the Director." *Id.*

There seems to be significant confusion within IDOC, presumably caused by the "or decisions that have been rendered by the Director" clause of section 504.810(a), as to whether a Tamms prisoner may grieve his transfer, IDOC did not challenge every plaintiff on exhaustion grounds, and treatment of grievances by IDOC's ultimate grievance appeal body, the Administrative Review Board ("ARB"), varied among the prisoners. For instance, the ARB responded to Mr. Combs' grievance complaining about improper placement at Tamms by offering reasons for the transfer (e.g., gang activity). This action would seem to indicate that the ARB, at least, believed the grievance process to be the proper challenge avenue. In contrast, although he is no longer a party to this suit, the treatment of Mr. Carroll's grievance is instructive, especially given that IDOC did not challenge whether he exhausted his remedies. The ARB simply replied to his complaint that transfer to Tamms was not an issue that it could address, but rather was an administrative prerogative of IDOC.

In addition, there is some evidence that a Tamms counselor told Mr. Knox that he could not grieve placement at the facility; this evidence the district court found sufficient to establish that Mr. Knox had exhausted all available administrative remedies. However, Mr. V. Rodriguez, one of the prisoners whose claims the district court dismissed for failure to exhaust, also submitted an affidavit setting forth a similar account. Prior to his transfer to Tamms, he received a disciplinary report at another facility, but he completed the appeal of that report after his transfer. Mr. V. Rodriguez claims that IDOC officials led him to believe that his administrative remedy lay in challenging his transfer to Tamms, together with an existing administrative appeal that he was pursuing to challenge disciplinary action.[11] In its supplemental brief, IDOC does not respond to or explain the inconsistent treatment.

Despite a number of Tamms-specific regulations in the Illinois Administrative Code, *see id.*, pt. 505, IDOC does not point to any regulation or department policy that clearly identifies how a prisoner challenges his transfer to Tamms. If, for example, the regulations specified that a prisoner must challenge his transfer through the grievance process, or indicated the form that such a challenge should take, the prisoners would be obliged to conform to those administra-

---

[11] Mr. V. Rodriguez was transferred to Tamms while awaiting a disciplinary action (assaulting a guard) through the IDOC administrative system. He claims that the grievance officer at Tamms told him that he could challenge his transfer together with his administrative appeal of the disciplinary action. Mr. V. Rodriguez never filed a separate grievance challenging his transfer because he claims that he was led to believe that, by appealing his transfer at the same time he appealed the disciplinary action, he exhausted his administrative remedies.

tive requirements. If the ARB took consistent positions on its authority to address a transfer grievance, a clear route for the prisoner at least would be evident and we could proceed to determine its effectiveness. But, as this case comes to us, we find the record "hopelessly unclear . . . whether any administrative remedy" remained open for the prisoners to challenge their transfers through the grievance process. *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002). With regard to Mr. Felton, Mr. Horton, Mr. V. Rodriquez and Mr. Santiago,[12] IDOC failed to meet its burden of proving that they failed to exhaust an *available* administrative remedy, *Dale*, 376 F.3d at 656, even after we afforded the opportunity to clarify the record through supplemental briefing.

Although we base our decision on IDOC's failure to meet its burden on the exhaustion issue, we pause to note as well that the district court erred in finding Mr. Felton's and Mr. Horton's grievances insufficient to "alert[ ] the prison to the nature of the wrong for which redress is sought," which is all that the PLRA requires. *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002). Although their purported placement challenges were made within substantive complaints about Tamms conditions, each prisoners' grievance expressed concern about not being told the reason for his transfer to Tamms or listed something to the effect of "Transfer from Tamms" as the requested remedy. These complaints were

---

[12] The district court dismissed Mr. Santiago because he submitted the grievance that he claimed exhausted his administrative remedies after this suit was filed. The appellants here do not challenge his dismissal. But, because it is unclear whether the grievance process may be used to challenge a prisoner's transfer to Tamms, Mr. Santiago's failure timely to file a grievance is of no moment, and we conclude that the district court erred in dismissing him on that ground.

sufficient to alert prison officials that Mr. Felton and Mr. Horton challenged their transfers, even though the grievance officers in each case addressed the prison condition complaints without mentioning their transfers to Tamms.

We therefore reverse the district court's dismissal of the claims of Mr. Felton, Mr. Horton, Mr. V. Rodriguez and Mr. Santiago.

## 2. Discovery

The litigation plaintiffs believe that they were sent to Tamms in retaliation for filing legal actions against IDOC and its officials.[13] Proving this theory required the prisoners to reconstruct the decision-making process leading to their transfers. To accomplish this task, the prisoners requested a number of documents from IDOC. Included in the requested documents were: placement forms for each prisoner; the results of any administrative reviews conducted since their arrival at Tamms; each prisoner's ARB file; the litigation files of each litigation plaintiff; documents listing prisoners considered eligible for placement in Tamms who

---

[13] Because the district court rejected the associational rights and the ex post facto counts of the gang plaintiffs, the remaining discovery disputes primarily involved the litigation plaintiffs. Indeed, given that the First Amendment and ex post facto complaints were dismissed early on, the district court and magistrate judge determined, correctly, that many of the prisoners' discovery requests had become irrelevant. Because the district court correctly dismissed these counts, we need not address the district court's handling of the prisoners' discovery requests aimed solely at proving the gang plaintiffs' associational rights and ex post facto violations.

were not transferred;[14] and any documents discussing the transfer of the named plaintiffs, rather than other prisoners, to Tamms.

Before considering the specific discovery disputes at issue in this appeal, it is useful to recount certain aspects of the discovery history in this case. The record reveals that both IDOC and the prisoners were slow in discovery. The prisoners delayed answering IDOC's interrogatories and, at one point, earned a warning about possible sanctions.[15]

---

[14] The prisoners sought records of non-Tamms inmates to demonstrate, among other things, that IDOC transferred the litigation plaintiffs but did not transfer prisoners who presented more severe disciplinary or gang-related problems. They argued that, together with their litigation files, these records would raise an inference that the litigation plaintiffs were transferred solely on the basis of their litigation activities.

[15] In a similar vein, later in the proceedings, the prisoners' identical form responses to IDOC's interrogatories were to become a matter of controversy. Every IDOC defendant except Mr. Snyder served three interrogatories on each remaining plaintiff. Mr. Snyder served four interrogatories; numbers 2 through 4 were the same as other officials' three interrogatories. The relevant interrogatory, numbered 1 generally but Mr. Snyder's number 2, read: "State the factual basis for your assertion that Defendant [official's last name] approved your transfer to Tamms Super Max Correctional Center in retaliation for litigation, grievances or 'writ writing.' " *See, e.g.*, R.69, Ex.3.

The prisoner responses were apparently drafted using Mr. Snyder's interrogatories as a model, and repeated for every prisoner in response to each IDOC official. Each prisoner gave the same response to the second interrogatory, that is, Mr. Snyder's second, even though, for the other officials, the response should have been to the first question. Regardless of which IDOC official
(continued...)

The circumstances surrounding the State's production of the placement forms, crucial to the prisoners' claim, must be examined in some detail.[16] IDOC eventually produced the forms and attached them to its renewed motion for summary judgment, together with affidavits from IDOC officers stating that they had relied on the placement forms when deciding the appropriateness of a prisoner's transfer to Tamms. The State argued that the officials' reliance on

---

[15] (...continued)
the prisoner addressed, the prisoner stated:

> I do not have any personal knowledge that defendant Snyder personally approved my transfer to Tamms. Rather, I contend that defendant Snyder approved policies and procedures which permitted prisoners to be transferred to Tamms in retaliation for activities which were protected by the First Amendment.

*See, e.g.*, R.69, Ex.29. The plaintiffs claimed that, "[r]ather than provide duplicative answers to the same questions asked separately by each of the defendants, plaintiffs sought to simplify their responses by combining all defendants' interrogatories." R.104 at 5.

[16] On October 28, 2002, at the same time the district court granted IDOC leave to renew its summary judgment motion, it ordered IDOC to produce documents relied on by the officials in deciding which prisoners to transfer to Tamms. The prisoners had asked for the documents with their initial discovery request in August 2000. A month later, IDOC produced approximately 7500 pages of documents in compliance. Based on the volume of material, the district court granted additional time, until January 29, 2003, for the prisoners to reply to IDOC's summary judgment motion. The district court subsequently granted a motion to file instanter, and the prisoners filed their response on February 10, 2003—the same day the court held a hearing on the summary judgment motion.

prisoner placement forms belied the prisoners' claim that IDOC transferred them in retaliation for any protected activity.

The prisoners then sought to introduce affidavits alleging that the information contained in the placement forms was untrue. They contended that IDOC officials had falsified their gang associations or disciplinary histories to justify their transfers to Tamms. IDOC moved to strike this evidence and all other evidence that the placement forms were incorrect, that the prisoners' disciplinary histories were insufficient to warrant assignment to Tamms, that the timing of their transfers was suspicious, and that Mr. Snyder could be held liable for the transfers.

In resisting the efforts of the prisoners to have the court consider the prisoners' evidence that the transfer documents were false, IDOC crafted its motion as a request for discovery sanctions. It argued that the prisoners had failed to amend their previous interrogatory answers (that is, their answer number 2)[17] to encompass the new falsification theories, in violation of Federal Rule of Civil Procedure 26(e)(2).

The district court granted IDOC's motion to strike on essentially two related grounds. First, the court considered the prisoners' answers to IDOC interrogatories to be "incomplete" under Federal Rule of Civil Procedure 37(a)(3) because they failed to present any supporting facts in spite of the interrogatories' request for "the factual basis for your assertion that Defendant . . . approved your transfer to Tamms." R.69, Ex.3. Second, the district court agreed with IDOC that the prisoners' contention—that information in

---

[17] *See supra* note 15.

their placement forms had been falsified—was a new theory based on new evidence. Because the prisoners failed to amend their responses to the IDOC interrogatories to reflect their new allegation and provide more complete factual bases for their claims, as required by Federal Rule of Civil Procedure 26(e)(2), the district court excluded from consideration the prisoners' affidavits (or any other evidence that they might have produced) contending that their placement forms had been falsified, as a sanction under Rule 37(c)(1).[18]

The prisoners' argument in this appeal is twofold.[19] First, they submit that the district court erred in concluding that they had violated Rule 26(e)(2) by not supplementing their interrogatory responses. Because IDOC had not produced the placement forms or other requested discovery when they answered the interrogatories, the prisoners note that they could not have known the falsehoods contained in the forms—falsehoods which formed the "factual basis" for their claim. The prisoners argue that they complied with the requirements of Rule 26 by offering affidavits, and they characterize any requirement to go back and supplement their interrogatory answers as a "duplicative, meaningless

---

[18] In addition, the district court noted that the prisoners' form responses to IDOC interrogatories mentioned only Mr. Snyder. *See supra* note 15. Because their responses were inadequate and only applied to Mr. Snyder, the district court determined that he was not liable as a matter of law and dismissed him from the suit. Given our decision concerning the propriety of the discovery sanction, it was inappropriate for the district court to dismiss Mr. Snyder at this stage of the litigation.

[19] IDOC argues that the prisoners have waived any challenge to district court discovery decisions because their brief does not comply with Federal Rule of Appellate Procedure 28(a)(9)(A). We find the prisoners' submission to be sufficient.

formality." Appellants' Br. at 44. Second, the prisoners assert that, even if they violated the letter of Rule 26, the district court abused its discretion by imposing its Rule 37 sanction.

Although we review the district court's discovery rulings for abuse of discretion, "[t]he district court must apply the correct legal standards and not reach an erroneous conclusion of law in forming the basis for the sanction of exclusion." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 755 (7th Cir. 2004). Reaching an erroneous legal conclusion constitutes an abuse of discretion. *Id.* We therefore first consider the district court's determination that the prisoners violated Rule 26 by failing to amend their interrogatories.

At the outset, we cannot accept the argument that, as a general proposition, the requirements of Rule 26 constitute a meaningless formality. Although the prisoners may disagree about its application to their case, "the formal requirements of Rule 26 are not pointless." *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004). Litigants would be well advised to conform their conduct in litigation to the Rules.

Under Rule 26,

[a] party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:

. . . .

(2) A party is under a duty seasonably to amend

> a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed. R. Civ. P. 26(e).

The prisoners submit that they complied with Rule 26 because they produced affidavits with their response to IDOC's summary judgment motion that stated clearly their allegation that the transfer forms state false reasons for the prisoners' transfers. They contend that the affidavits "otherwise . . . made known . . . in writing" to IDOC that the prisoners contested the truthfulness of their placement forms and therefore complied with Rule 26. Accordingly, they submit, they are excused from actually amending their interrogatories.[20]

---

[20] It appears from the record that the prisoners argued for the first time in this appeal that by submitting their affidavits they complied with Rule 26's "otherwise . . . made known" clause. This is not the argument that they made before the district court. Rather, in opposing the State's motion to strike their evidence, the prisoners asserted several points. First, they contended that the affidavits were consistent with their interrogatory answers. Second, the prisoners noted that they informed the IDOC officials that they would supplement their interrogatory answers if the officials specified what information was missing—a specification that the prisoners never received. Third, they argued that any failure to amend their interrogatories should be excused because they were swamped with discovery only two months before the
(continued...)

The prisoners' argument has merit. The present situation is governed by the "otherwise" clause in Rule 26(e)(2). *See Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 733 (7th Cir. 2004). Although the prisoners did not amend their interrogatory answers, their response to IDOC's summary judgment motion placed the officials on written notice that the prisoners challenged the placement forms' veracity. There was no unfair surprise in the prisoners' failure to amend their interrogatories, especially given IDOC's delay in producing the relevant documents. The prisoners' submissions complied with Rule 26.

Because the district court declined to consider the prisoners' contention that information in their placement forms was false, it assumed the forms to be true when analyzing IDOC's rationale for transferring the plaintiffs. The prisoners were left only with chronologies indicating that their transfers were suspicious; the district court found these chronologies to be inadequate to allow the prisoners to survive summary judgment. We cannot say whether the

---

[20] (...continued)
motion was heard and more than two years after they first requested the documents.

We ordinarily refuse to consider arguments not made before the district court. However, we also hold fast to the principle that a defense of waiver may itself be waived if not raised. *See Riemer v. Illinois Dep't of Transp.*, 148 F.3d 800, 804 n.4 (7th Cir. 1998). In their submission to this court, IDOC's waiver argument on this issue is focused solely on the adequacy of the prisoners' brief; the officials do not argue that the appellants have waived their contention that submitting affidavits complied with their Rule 26 obligations. We therefore find that IDOC waived any waiver argument on this issue, and we will consider the prisoners' submission.

district court would have reached the same conclusion had it considered, in addition to the chronologies, evidence that IDOC relied on false placement forms in transferring the prisoners, or other evidence establishing that the prisoners were transferred in retaliation for their litigation activities. The district court should have considered the prisoners' allegations and summary judgment based on its refusal to do so was inappropriate.[21]

---

[21] Even if the prisoners had failed to comply with Rule 26 by not amending their interrogatory responses, we do not believe that the district court should have excluded the prisoners' evidence as a sanction.

Rule 37 provides that a party who fails to amend an interrogatory response under Rule 26(e)(2) "*is not*, unless such failure is harmless, permitted to use as evidence . . . information not so disclosed." Fed. R. Civ. P. 37(c)(1) (emphasis added). Notably, contrary to what the prisoners seem to argue here, there is no sliding scale of sanctions under Rule 37. In the Rule 26(a) context, we have noted that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). Similarly, here once the district court found a Rule 26 violation, it was obligated to exclude the offered evidence unless the prisoners' failure to amend was harmless or justified. *See Williams v. Morton*, 343 F.3d 212, 222 (3d Cir. 2003).

The determination of whether a failure is harmless or justified is left to the broad discretion of the district court. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). The trial court need not make explicit findings regarding a justification or the harmlessness of the Rule 26 violation, *id.*, but

we have indicated that the following factors should guide the
(continued...)

[21] (...continued)
> district court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.

*Id.* (citing, among others, *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995)).

In this case, the prisoners argued in their response to IDOC's motion to strike that any violation of Rule 26 on their part was harmless. The district court responded to this argument with a single sentence: "The Court finds that Plaintiffs have not submitted sufficient justification for their failure to amend their interrogatory responses and that this failure is not harmless." R.106 at 6. The district court's one-sentence discussion of the issue before imposing a Rule 37 sanction did not constitute the "thoughtful discussion" that would assure us that the court considered the *David* factors. *David*, 324 F.3d at 858. Indeed, our review of the history of this case indicates that application of the *David* factors leads to a conclusion that any Rule 26 violation was harmless.

There is no evidence that the prisoners' failure to amend their interrogatory responses was the result of willfulness or bad faith; indeed, it seems clear that IDOC resisted producing discovery, delayed in submitting the placement forms and, in the end, deluged the prisoners with document production shortly before the district court resolved its summary judgment motion.

Nor can we say that the prisoners' failure to amend their interrogatory responses prejudiced or surprised IDOC because the prisoners offered their falsification theory shortly after discovering it through IDOC's late discovery. Indeed, if there was prejudice in this case it was to the plaintiffs, based on IDOC's delayed production. *Cf. Rosario v. Livaditis*, 963 F.2d 1013, 1019 (7th Cir. 1992) ("A party who fails to pursue discovery in the face
(continued...)

### C. All Prisoners' Due Process Claim

Both groups of prisoners, the litigation plaintiffs and the gang plaintiffs, submit that the district court improperly dismissed their due process claims. These claims alleged that the transfer to Tamms constituted punishment and therefore required that the prisoners receive notice and a hearing. The district court read our decision in *Wagner v. Hanks*, 128 F.3d 1173 (7th Cir. 1997), to imply that the prisoners would have a liberty interest only if the conditions at Tamms were significantly more restrictive than administrative detention at the most secure prison in the state. In this case, that prison is the one where the prisoners are incarcerated, Tamms. Under the district court's reading of *Wagner*, no prisoner in administrative detention at Tamms could make out a due process claim. Additionally, held the court, because the prisoners offered no evidence showing that disciplinary segregation at Tamms was significantly more restrictive than administrative detention at the facility (indeed, the evidence seems to suggest that the conditions are equally harsh), prisoners in disciplinary segregation status likewise failed to demonstrate a liberty interest.

Our colleague in the district court had to deal with these contentions without the benefit of the Supreme Court's decision in *Wilkinson v. Austin*, 125 S. Ct. 2384 (2005).

---

[21] (...continued)
of a court ordered cut-off cannot plead prejudice from his own inaction."). Moreover, any prejudice that IDOC did suffer easily could have been cured by granting IDOC additional time in which to respond to the new allegations. Therefore, even if the prisoners had violated Rule 26 by failing to amend their interrogatory responses, the district court abused its discretion in excluding evidence supporting their falsification theory.

*Wilkinson* gives substantial guidance on the appropriate resolution of the issues in the present case. Consequently, after its rendition by the Supreme Court, the parties to this case submitted their views on how the Court's rationale ought to affect our decision in this case.

*Wilkinson* upheld, against a due process challenge, Ohio's procedure for transferring prisoners to the Ohio State Penitentiary ("OSP"), that state's "supermax" prison, a facility designed to hold the most dangerous prisoners who posed a special threat if incarcerated in the general prison population. At OSP, almost every aspect of the inmate's life was controlled and monitored. Extreme isolation was imposed; opportunities for visitation were sharply curtailed and always conducted through glass walls. The inmates were deprived of almost every form of environmental or sensory stimuli. There was very little human contact. A prisoner could be placed in the supermax for an indefinite period of time; only the length of the prisoner's sentence marked the outer limits of his stay. If an inmate was other-wise eligible for parole, he lost that eligibility while as-signed to the facility.

Under the policy finally adopted by Ohio to govern the selection of prisoners for placement in the supermax facility, a prison official conducted, prior to placement, a classifica-tion review. This review focused on the offense of convic-tion in the case of prisoners just committed to the prison system and on certain types of conduct in the case of those already incarcerated. The prisoner was notified of the factual basis for a recommendation for placement in the supermax and given a fair opportunity for rebuttal at a hearing. He could not, however, call witnesses. Addition-ally, prior to the final level of review, the prisoner was given an opportunity to submit objections to the recommendation. There were three levels of review. At each level, a decision

against placement in the supermax facility terminated the process and the prisoner was not assigned to the supermax. After placement in the supermax prison, a prisoner received a review after thirty days and an annual review thereafter.

The Supreme Court held that prisoners had a constitutionally protected liberty interest in avoiding assignment to OSP. Reiterating the conclusion it reached in *Meachum v. Fano*, 427 U.S. 215, 225 (1976), the Court noted "that the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson*, 125 S. Ct. at 2393. However, continued the Court, "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Connor*, 515 U.S. 472 (1995)." *Id.* The Court went on to emphasize that *Sandin* pointedly had rejected the methodology of parsing the language of particular regulations. Rather, "the touchstone of the inquiry into the existence of a protected, state-created liberty interest . . . is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.' " *Id.* at 2394 (quoting *Sandin*, 515 U.S. at 484).

The Supreme Court then went on to apply the methodology of *Sandin* to the situation before it. It noted the inconsistent results that courts of appeals have reached in applying the *Sandin* formula because it is difficult to determine a baseline from which to ascertain whether the conditions of confinement are an atypical and significant hardship. Noting the absence of briefing on the subject in the case before it, the Court nevertheless concluded that it was unnecessary to explore the issue because the conditions at OSP posed an "atypical and significant hardship under any

plausible baseline." *Id.* It described those conditions in these terms:

> For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin*, placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP.

*Wilkinson*, 125 S. Ct. at 2394-95 (citations omitted).

Having determined that the conditions at the Ohio supermax facility imposed an atypical and significant hardship within the correctional context and thus constituted the deprivation of a liberty interest, the Supreme Court turned to the question of what process was required before such conditions were imposed on a prisoner. Reminding the reader that the Court previously has avoided the use of rigid rules, *see Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), in favor of flexibility tailored to the particular situation, the Court articulated the familiar framework of *Mathews v. Eldridge*, 424 U.S. 319 (1976), that requires a court to consider the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous depriva- tion of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

With respect to the first factor, the Court noted that the private interest of the prisoner to be free from confinement, while "more than minimal," had to be evaluated in the context of the prison system where, pursuant to a lawful sentence, confinement already has curtailed liberty to a great degree. *Wilkinson*, 125 S. Ct. at 2395. The private liberty interest, then, is clearly not as plenary as that of an individual not under the sentence of a court. With respect to the second factor, the Court focused on Ohio's provision for notice and opportunity to rebut the reasons offered by the State for placement in OSP. *Id.* at 2396. The Court noted that, in addition to notice and hearing, the prisoner was given an opportunity to submit a rebuttal to an affirmative recom- mendation at the last of three levels of review. Moreover, a recommendation against placement at any level ended the process and the prisoner was not placed at the supermax. If a reviewer did recommend placement in the supermax, the prisoner received a statement of reasons for use before the next decision-maker or in a subsequent classification review. The statement also served, noted the Court, as a guide for the prisoner with respect to his future behavior. Finally, noted the Court, the Ohio regulations provided for a review after the prisoner had been at the supermax facility for thirty days. In the Court's view, this regulatory scheme adequately ensured against an erroneous decision in the

placement process.

The Court minced no words in applying the third *Mathews* factor, the interest of the public officials charged with the responsibility of running prisons. *See id.* at 2396-97. The State's first responsibility, the Court wrote, is to ensure the safety of guards, prison personnel, the public and the prisoners themselves. The Court also noted the pressing need of the State to manage prudently its assets in a context of scarce resources. Therefore, concluded the Justices, courts must approach estimations such as the one required by the third prong of the *Mathews* test with substantial deference to prison management decisions. *Id.* at 2397.

After balancing the *Mathews* factors, the Court concluded that Ohio's policies adequately safeguarded against an erroneous decision. The Court pointed out that the inquiry here is not an inquiry into a specific incident, but an assessment of a prisoner's entire record and a prognostication about future behavior. Such a decision does not turn simply on whether the prisoner committed a specific act. Rather, it turns on an assessment that requires the experience of prison administrators—an assessment that is more susceptible to resolution in an informal procedure.

We turn now to an examination of how the Supreme Court's recent guidance in *Wilkinson* governs the case before us. As we noted earlier, we have the assistance of counsel for both parties through the thoughtful supplemental briefs they have filed recently.

The State of Illinois, representing its defendant officials, takes the position that, under *Wilkinson*, the prisoners cannot claim a cognizable liberty interest. First, it notes that there are some differences between Tamms and OSP with respect to the conditions of confinement. The cells in Tamms, it points out, have windows; the doors are mesh

rather than solid steel; the exercise yard is partially out-
doors. It also points out that, although the prisoners allege
that visitation at Tamms is cumbersome and expensive,
especially for individuals from the Chicago area, they do
not allege, as the Ohio prisoners did, that the opportunities
for visitation are rare. More important, continues the State,
assignment to Tamms does not affect the length of confine-
ment because nothing in the regulations says that placement
at Tamms directly affects parole eligibility, mandatory
supervised release, good conduct credits or good time
restoration. In the State's view, this latter point is crucial
because it reads both *Wilkinson* and *Sandin* as grounding a
recognition of liberty interest on the effect of the state-
imposed restraint on the length of the prisoner's sentence.

In the alternative, the State claims that, even if there is a
liberty interest implicated in a placement at Tamms, the pre-
and post-transfer procedures for such assignments satisfy
the needs of due process. It begins its argument by empha-
sizing that *Wilkinson* requires only an informal,
nonadversarial process. It also points out that the Supreme
Court did not say that the detailed procedures employed by
Ohio were to be considered a constitutional floor.

The prisoners take a different view of the applicability of
*Wilkinson.* They emphasize the procedural posture of this
aspect of the present case. Because the district court dis-
missed the due process claim of the complaint on the
pleadings, we are obliged to read all the allegations of that
complaint in the light most favorable to the plaintiffs. They
further submit that the complaint contains statements that
clearly allege that the conditions at Tamms fit the profile for
"atypical and significant hardship" as that phrase is em-
ployed in *Sandin* and in *Wilkinson.* They specifically note the
following:

Plaintiff's Amended Complaint alleged:

9. Tamms is designed to be extremely harsh. IDOC officials have stated that they want conditions at Tamms to be so bad that inmates throughout the system are motivated to follow all departmental rules based upon the mere threat of being transferred to Tamms.

10. The conditions of confinement at Tamms present inmates with atypical and significant hardships in relation to the ordinary incidents of prison life, including the hardships imposed at the most restrictive segregation units in Illinois' maximum security prisons. At Tamms, control and punishment are imposed through extreme social isolation, severely restricted movement, and an environment that virtually eliminates all external stimuli.

Plaintiffs' amended complaint describes the extraordinarily restrictive conditions imposed on prisoners at Tamms in great detail (¶'s 11-24). The restrictions include (among others) virtually complete absence of human contact (¶'s 11, 15, and 18), virtual elimination of all out of cell movements (¶'s 12, 14, 18), severe restrictions on showers and out of cell exercise (¶'s 16 and 19), severe restrictions on family visits (¶ 20), elimination of all jobs and other programming (¶ 14), severe restrictions on religious services (¶ 21) and on a prisoner's communication with attorneys (¶ 22). Property is similarly restricted (¶ 14). In sum, being confined to Tamms is to be subjected to virtual sensory deprivation, with prisoners forced to spend most days doing literally nothing but staring at the four blank walls of their cells.

In Count Three of their amended complaint, plaintiffs allege (¶ 120):

120. Transfer to Tamms subjects plaintiffs to atypical and significant hardships in relation to the

> ordinary incidents of prison life and to hardships which are not experienced at the most restrictive segregation unit at any of the maximum security prisons in Illinois.

Appellants' Supplemental Br. at 3-4.

With respect to the other factors mentioned in *Wikinson*, the prisoners note that, although prisoners at Tamms are eligible for parole, there are strict limits on the good time that they can earn because of the lack of rehabilitative programs at the facility. With respect to the length of time that a prisoner can be incarcerated at Tamms, the prisoners simply point out that the only time limit is the length of the underlying sentence.

With respect to the available procedures for contesting a placement in Tamms, the prisoners point out the absence of any hearing for those in disciplinary status and the lack of notice as to the reasons for the placement in the case of those in administrative detention. They also note the lack of any pre-placement hearing for those in administrative detention.

We believe that the allegations of the complaint, which we must accept as true at this stage of the litigation, preclude dismissal under the now-governing standards of *Wilkinson.* There are some differences between the features of the Ohio supermax at issue in *Wilkinson* and those of the Illinois facility at issue here. It is not at all clear, however, that those differences are so qualitatively different as to require a different characterization of the facility for purposes of due process analysis under *Wilkinson.* Illinois' contention that the liberty interest identified in *Wilkinson* turned exclusively on the absence of parole constitutes, our view, far too crabbed a reading of the decision. The very text of the decision belies such a claim in noting that, "[w]hile any of

these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Wilkinson*, 125 S. Ct. at 2395. We also note that, if, after considering all the evidence submitted by the parties, the district court is not of the view that the Illinois situation is, like the Ohio facility, "an atypical and significant hardship under any plausible baseline," *id.* at 2394, the district court must confront the issue of what does constitute the appropriate baseline for the Illinois system. *See id.*

Assuming that a liberty interest is determined to exist, the district court will then have to confront whether the procedures that we have discussed at some length with respect to the exhaustion of administrative remedies provide sufficient process to protect the prisoners' liberty interest in this case. The fact that the procedures available in Illinois are different from those employed in Ohio is, of course, in no way outcome determinative. The Supreme Court has made clear that application of the *Mathews* test requires flexibility with respect to the precise procedural devices employed. The Court has made clear that the informal, nonadversarial procedures set forth in *Hewitt v. Helms*, 459 U.S. 460 (1983) and *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1 (1979), are the appropriate models. *See Wilkinson*, 125 S. Ct. at 2397.

On the basis of what we can ascertain on this record, it appears that the district court will have to evaluate with particular care whether the prisoner is given sufficient notice of the reasons for his transfer to afford meaningful opportunity to challenge his placement. With respect to prisoners in disciplinary status, there is the added question of whether the disciplinary hearing on the underlying disciplinary violation is a sufficient vehicle by which to challenge the Tamms placement. For those in administrative

status, the lack of any pre-transfer hearing may require close examination. *See Hewitt*, 459 U.S. at 477. The district court also must, of course, consider the matter of continued monitoring of the situation after the initial transfer decision. *See id.* at 477 n.9.

Finally, with respect to the viability of the grievance procedure to contest a placement at Tamms, the district court must explore fully the allegation that IDOC's conflicting pronouncements on the use of this procedure to challenge placement renders it useless.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the district court with respect to all claims but the retaliation claim and the due process claim. With respect to these claims, the judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion. The parties shall bear their own costs on this appeal.

AFFIRMED in part; REVERSED and REMANDED in part

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*