In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1112

JAMES E. KILLIAN, as Independent Administrator
of the Estate of Susan M. Killian,

*Plaintiff-Appellant,*

*v.*

CONCERT HEALTH PLAN, CONCERT HEALTH PLAN
INSURANCE COMPANY, ROYAL MANAGEMENT
CORPORATION HEALTH INSURANCE PLAN, and
ROYAL MANAGEMENT CORPORATION,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 4755—**Marvin E. Aspen** and **Gary S. Feinerman**, *Judges.*

ARGUED SEPTEMBER 29, 2011—DECIDED APRIL 19, 2012

Before RIPPLE, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* After discovering that she had lung cancer that had spread to her brain, Susan M. Killian sought the advice of a doctor whom she trusted. On that doctor's recommendation, Susan underwent

aggressive treatment. Unfortunately, the treatment was ultimately unsuccessful and she died a few months later. By that point Susan's husband, James E. Killian, had received numerous medical bills for the cost of Susan's treatments. James submitted those medical bills to Concert Health Plan Insurance Company, Susan's health insurance company, for reimbursement, but was denied coverage on most of the expenses because the provider that the Killians had used was not covered by Susan's insurance plan network. James ultimately filed suit, seeking benefits for incurred medical expenses, relief for a breach of fiduciary duty, and statutory damages for failure to produce plan documents. At the summary judgment stage of the case, the district court dismissed James's denial-of-benefits and breach-of-fiduciary-duty claims, but awarded him minimal statutory damages against the health plan administrator. James has appealed. We hold that the district court properly granted summary judgment on James's denial-of-benefits and breach-of-fiduciary-duty claims, but incorrectly calculated James's statutory damages award. We therefore affirm in part and remand in part, with instructions outlined below.

## I.

Susan Killian's employer, Royal Management Corporation, entered into an agreement with Concert Health Plan Insurance Company to provide group health insur-

ance coverage to all of Royal Management's employees.[1] This agreement became effective on July 1, 2005. Under the agreement, Royal Management was named the plan administrator for the Royal Management Corporation Health Insurance Plan (the "Royal Plan"). Concert was named the claims review administrator, a title that includes the "full and exclusive discretionary authority to: (1) interpret [Royal Plan] provisions; (2) make decisions regarding eligibility for coverage and benefits; and (3) resolve factual questions relating to coverage and benefits." Concert was also listed as the Employee Retirement Income Security Act ("ERISA") claims review fiduciary.

The Royal Plan offered three different options from which employees could choose. Susan enrolled in the Royal Plan and selected insurance coverage option "SO35." All three Royal Plan options afforded participants access to lower-cost medical services by health care providers that were deemed to be within a given network—namely, providers with whom Concert had

---

[1] A not-for-profit corporation named Concert Health Plan provides administrative services for health plans issued by Concert Health Plan Insurance Company. James Killian named both of these entities as defendants; however, the district court dismissed Concert Health Plan from this suit with prejudice because James "failed to come forward with specific facts sufficient to raise a genuine question as to [Concert Health Plan's] involvement." James does not appeal this decision; therefore, our use of "Concert" in this opinion will refer only to Concert Health Plan Insurance Company and we will not discuss Concert Health Plan's involvement further.

negotiated for lower fees. The SO35 option that Susan selected was included as part of the PHCS Open Access network of service providers. In documentation received after enrolling in the Royal Plan, employees—including Susan—were cautioned that, "to avoid reduced benefit payments, obtain Your medical care from SELECT providers whenever possible." Additionally, employees were admonished that, "[t]o confirm that Your Hospital, Qualified Treatment Facility, Qualified Practitioner or other provider is a CURRENT participant in Your SELECT provider Network, You must call the number listed on the back of Your medical identification card."

By February 2006, Susan was suffering from persistent headaches and a severe cold. Susan sought treatment from her primary care physician who ordered a CT scan. The CT scan's results were haunting: Susan was diagnosed with lung cancer that had spread to her brain. She was admitted to Delnor Community Hospital by direction of her primary care physician; after five days, she was told that her brain tumors were inoperable. Desiring a second opinion, the Killians contacted Rush University Hospital and Dr. Philip Bonomi to set up an appointment. Susan was familiar with Dr. Bonomi because he had treated Susan's daughter several years earlier. Besides their familiarity and apparent comfort with Dr. Bonomi, the Killians had no other reason for seeking him out.

Susan's appointment with Dr. Bonomi was scheduled for April 7, 2006. The Killians did not ask either Concert

or Royal Management about whether the treatment provided by Dr. Bonomi or Rush University Hospital was within the PHCS Open Access network of providers. Indeed, James averred that neither he nor Susan inquired about whether Susan's treatment by Dr. Bonomi or Rush University Hospital was in-network before Susan's appointment on April 7. Further, James testified that Susan and he would have sought a second opinion from Dr. Bonomi regardless of whether he was in the PHCS Open Access network.

When the Killians arrived at Rush University Hospital for Susan's April 7 appointment, they first saw a neurosurgeon by the name of Dr. Louis Barnes, to whom they had been referred by Dr. Bonomi. Dr. Barnes told the Killians that one of Susan's tumors had to be removed immediately. According to James, "Dr. Barnes stated [that] if he didn't take the tumor [out of Susan's brain] she would be dead within five days." At that point, as Susan was being processed for admission to Rush University Hospital, James called Concert at a toll-free number he found on Susan's medical insurance identification card. There were three toll-free numbers on Susan's card: one to determine provider participation; one for customer service or utilization review; and one for prescription drug service. James testified that he first called the "top number" (the provider-participation number).

During this initial call there was some confusion between James and the Concert representative regarding the name of the hospital to which Susan was being ad-

mitted. James kept referring to St. Luke's Hospital and the representative was not aware of a hospital by that name. (Apparently that was the name of the hospital some years earlier.) She told James to call back later, but then she told him to "go ahead with whatever had to be done." When he did call back he dialed a different number—the customer service/utilization review number. Despite having dialed a different number, James apparently reached a representative who knew of his earlier confusion about the hospital's name. James told this second representative that "I'm trying to get confirmation that we are going to be—my wife is going to be admitted to Rush." That representative said, apparently in jest, "Oh, you mean St. Luke's." After chuckling with someone seated near her (presumably another representative who was familiar with James's first phone call), the second representative said, "You mean Rush Presbyterian." James replied, "Oh, okay. That is what they are calling it." He then stated, "Susan is going to be admitted," to which the representative responded, "Okay." Importantly, during neither phone call did James and the two Concert representatives discuss whether Susan's treatment at Rush University Hospital by Dr. Barnes was within the PHCS Open Access network of providers.

Shortly after she was admitted to Rush University Hospital, Susan underwent surgery and was hospitalized from April 7 to April 12. Following her discharge from Rush University Hospital, Susan saw Dr. Bonomi "one or two times" for outpatient care. In June 2006, acting on orders from Dr. Bonomi, James again took Susan to

Rush University Hospital on suspicion that she might have pneumonia. Susan was admitted and was hospitalized for nine days. After Susan was discharged, she tried chemotherapy but could not tolerate the treatment. Susan died in August 2006.

During the months Susan battled cancer, the Killians received several Explanation-of-Benefit invoices from Concert that detailed medical claims that Concert would not cover because the treatment Susan received was by out-of-network providers. These out-of-network medical expenses totaled approximately $80,000. On July 31, 2006, James wrote to Concert's Claims Department, explaining Susan's dire health status and citing provisions in her Certificate of Insurance that James believed were inconsistent with Concert's rejection of Susan's claims. Concert replied in two letters dated September 19 and 20, 2006, reiterating that the claims referenced in its Explanation-of-Benefits invoices were out-of-network and, therefore, the Killians were individually responsible for the maximum allowable fee. James requested further review, which was referred to Concert's Appeals Committee. On October 25, 2006, the Committee issued a ruling largely affirming Concert's denial of benefits; however, the Committee agreed to process one claim at the in-network fee level because that claim was based on emergency treatment for pneumonia that Susan received in June 2006.

James Killian, acting in his capacity as the administrator of Susan's estate, filed suit in August 2007, in the Northern

District of Illinois, Eastern Division. James amended his complaint twice, each time adding more parties and causes of action. Ultimately, James alleged three violations of the ERISA, 29 U.S.C. §§ 1001, *et seq.*: (1) a denial-of-benefits claim against the Royal Plan and Concert; (2) a breach-of-fiduciary-duty claim against Royal Management and Concert; and (3) a statutory-penalties claim against Royal Management for failure to provide insurance plan documents.[2]

This case was first assigned to District Judge Marvin E. Aspen. At the close of discovery, both Royal Management (for itself and for the Royal Plan) and Concert moved for summary judgment on all of James Killian's claims. Judge Aspen granted Concert's motion in its entirety and granted Royal Management's motion in part. Judge Aspen stated that James's denial-of-benefits claim hinged on whether the communications James received from Concert concerning the denial of Susan's claims "substantially complied" with ERISA requirements. Importantly, Judge Aspen noted that James did not contest Concert's denial of benefits on the merits; "[t]hat is, [James] does not contest [Concert's] conclusion that no further benefits were payable because the health care providers at issue were out of Susan's network." Although he found that Concert's notification

---

[2] As explained in greater detail below, the statutory-penalties claim was added to James's second amended complaint when Royal Management failed to comply with his document request during discovery.

letters were technically deficient, Judge Aspen held that they substantially complied with ERISA requirements because they supplied James with Concert's reason for denying Susan's claims, thereby allowing James to bring this suit. Further, Judge Aspen noted that the only remedy available to James would be to remand the matter to Concert for further explanation of its denial of benefits to Susan. And because James had never argued that he could not comprehend Concert's decision, that he was unable to challenge it, or that it was wrong, Judge Aspen concluded that remanding the matter to Concert would be a useless formality. Accordingly, Judge Aspen granted summary judgment to Concert and Royal Management on James's denial-of-benefits claim.

Judge Aspen also granted summary judgment to Concert and Royal Management on James's breach-of-fiduciary-duty claims. In doing so, Judge Aspen rejected two of James's arguments, but the one most relevant to this appeal is the argument that Concert and Royal Management, as co-fiduciaries, had failed to provide accurate information to Susan in the form of a summary plan description ("SPD")[3] and a list of network providers. Judge Aspen stated that under this cir-

---

[3] ERISA provides that "a summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in [29 U.S.C.] § 1024 . . . ." 29 U.S.C. § 1022(a). We will discuss further SPD requirements below, as well as their bearing on this case.

cuit's case law, a fiduciary's failure to provide accurate information is only cognizable under extraordinary circumstances; namely, bad faith or active concealment on the part of Concert and Royal Management, or detrimental reliance on his part. Because James failed to demonstrate such extraordinary circumstances, Judge Aspen found that summary judgment was appropriate.

But Judge Aspen refused to grant summary judgment to Royal Management on James's statutory-penalties claim. Judge Aspen noted that the documents that Royal Management had produced did not constitute a valid SPD, and thus that James might be entitled to statutory penalties. But because James had not yet moved for summary judgment on that issue, Judge Aspen ordered supplemental briefing on whether James was entitled to statutory penalties both for Royal Management's failure to produce an SPD and for its failure to produce a copy of the group policy.

Following Judge Aspen's order, James immediately filed a motion for reconsideration. In that motion, James contended that the district court failed to take into account our decision in *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452 (7th Cir. 2010), as well as a case that was then pending before the Supreme Court, *Cigna Corporation v. Amara*, 131 S. Ct. 1866 (2011). James also specifically protested the district court's failure to address the fact that he placed two phone calls to Concert on the day Susan was admitted to Rush University Hospital and received no warning that Rush University Hospital was out-of-network. This, according to James, was a breach

of fiduciary duty. Judge Aspen distinguished *Kenseth* on its facts and found *Amara* to be inapposite. Additionally, Judge Aspen noted that James failed to raise the argument in his responsive memorandum that Concert breached its fiduciary duty by failing to provide him with information during the two phone calls on April 7, 2006, and, therefore, that the argument was waived.

After Judge Aspen issued his orders, the case was transferred to Judge Gary S. Feinerman for resolution on James's statutory-penalties claim. Judge Feinerman disposed of the case by ordering Royal Management to pay $5,880 in statutory damages. James appeals the district court's grant of summary judgment on his denial-of-benefits and breach-of-fiduciary-duty claims, as well as the court's calculation of his statutory damages award.

## II.

We review the district court's granting of summary judgment de novo. *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 989 (7th Cir. 2005). In doing so, we must construe all facts and draw all inferences in favor of the nonmoving party. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 653 (7th Cir. 2010). We will affirm if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, we review a district court's statutory damages award under 29 U.S.C. § 1132(c) for an abuse of discretion. *Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851, 858 (7th Cir. 2002).

A. Denial-of-Benefits Claim

James contends that the district court erred in granting both Royal Management's (on behalf of the Royal Plan) and Concert's motions for summary judgment on his denial-of-benefits claim. As we noted above, this claim stems from Concert's denial of the Killians' request to pay out-of-network medical expenses both on initial review and by the Appeals Committee. Importantly, it is undisputed that Concert, as the fiduciary and claims review administrator, had "full and exclusive discretionary authority" to interpret the Royal Plan's provisions and make coverage and benefit decisions. Thus, we review Concert's decision to deny benefits under the deferential arbitrary-and-capricious standard. *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005). Under this standard that is entitled to great deference, "we cannot overturn a decision to deny benefits unless it is 'downright unreasonable.'" *Ruiz*, 400 F.3d at 991 (quoting *Blickenstaff v. R.R. Donnelley & Sons Co.*, 378 F.3d 669, 677 (7th Cir. 2004)). Therefore, the "'insurer's decision prevails if it has rational support in the record.'" *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006) (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)).

James argues that Concert's decision was arbitrary and capricious because there is nothing in the record that establishes that Susan received treatment from an out-of-network provider. Specifically, James complains that the plan documents that he received from the Royal Plan are contradictory and do not contain a

list of network providers. Therefore, James argues, Concert's decision to deny Susan's claims lacked rational support in the record.

James's first argument—that he received plan documentation with contradictory information—focuses on two documents in particular: a Certificate of Insurance and an Employee Benefits Summary. The main issue, James contends, is that the Certificate of Insurance and the Employee Benefits Summary do not call Susan's plan by the same name. The Certificate of Insurance refers to the plan as the "SELECT provider network," while the Employee Benefits Summary dubs the plan the "PHCS Open Access" network. Given this contradictory information, James questions how Concert could discern whether Susan's treatment at Rush University Hospital was conducted by in- or out-of-network providers. In other words, James argues that this apparent conflict means that Concert's decision to deny Susan benefits was not rationally related to the record.

There is no conflict. The Certificate of Insurance and the Employee Benefits Summary do not refer to different networks. A cursory reading of the Certificate of Insurance clearly shows that the "SELECT provider Network" referred to is not the name of a specific network. Rather, that phrase alerts the insured to insert the name of the provider network that the insured "selected."[4] The supporting documentation plainly shows

---

[4] For example, the first sentence in the introductory "Notices" section reads: "SELECT provider Organizations are networks of

(continued...)

that the network Susan selected was the PHCS Open Access network. In the Certificate of Insurance packet that the Killians had in their possession, Susan's plan code is clearly identified as SO35. Further, the Employee Benefits Summary identifies Susan's network as the PHCS Open Access network and also lists—on the very same page—the three different benefit plan options that are available under that network. Susan's plan code, SO35, is listed as one of those plan options. And most convincingly, Susan's insurance card—the same card from which James gleaned Concert's customer service telephone number before placing two calls on April 7, 2006—clearly identifies her network as the PHCS Open Access network while listing her group code as SO35. Thus, when taken as a whole, the documentation shows that Concert could have readily discerned which health plan Susan chose and to which network she belonged at the time Concert made its decision to deny her benefits.

Second, James argues that because there is no list of providers in the record, Concert could not have made a rational decision that Susan's treatment by doctors at

---

[4] (...continued)
Hospitals, Qualified Treatment Facilities, Qualified Practitioners, and other providers that are contracted to furnish, at negotiated fees, medical Services for Employees (and their covered Dependents) of participating Employers." There is nothing in this sentence that points to a specific network provider; it is obviously intended to act as a boilerplate explanation of how the network-provider system works.

Rush University Hospital was out-of-network. It is true that the record does not include a network-provider list. Concert admits as much in its brief. Therefore, James asks us to remand this issue for further development of the record and a final determination. *See Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996), *cert. denied*, 521 U.S. 1129 (1997) ("The remedy when a court or agency fails to make adequate findings or to explain its grounds adequately is to send the case back to the tribunal for further findings or explanation.").

We will not remand, however, where doing so would be a "useless formality." *Schleibaum v. Kmart Corp.*, 153 F.3d 496, 503 (7th Cir. 1998) (citing *Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 394 (7th Cir. 1983)). Concert has consistently maintained that Susan's treatments were out-of-network and James has never argued that Rush University Hospital, Dr. Bonomi, or Dr. Barnes were actually in Susan's network. In fact, at oral argument James's counsel stated that, if this issue were remanded, he "suspected" that the claims review administrator would conclude that Susan's treatment at Rush University Hospital was out-of-network. Accordingly, we affirm the district court's holding that Concert's denial of benefits was not arbitrary and capricious.[5]

---

[5] The dissent contends that, because "Mr. Killian now seeks judicial review of [Concert's] substantive determination," we must remand for a definitive finding that Susan's providers were actually out of network. But that merely begs the question of whether such a remand is necessary. Again, James has never

(continued...)

## B. Breach-of-Fiduciary-Duty Claim

James argues that Concert and Royal Management breached their fiduciary duties in two ways: first, by not providing Susan with an SPD; and second, by failing to apprise James that Rush University Hospital was not in Susan's network despite James's two phone calls to Concert on April 7, 2006. In short, James alleges that Concert and Royal Management breached their fiduciary duties by failing to make required disclosures. *See Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781, 808 (7th Cir. 2009) ("[W]hen a fiduciary fails to make the types of disclosures expressly required by the statute, it has breached its fiduciary duty to the plan beneficiary . . . .").[6]

---

[5] (...continued)
argued that Susan's providers were actually in her network, and his counsel admitted that any remand on the issue would likely lead to an unfavorable outcome. If there were any likelihood that Susan's providers were actually in her network, there is no doubt that James would have vigorously pressed that argument. He has not done so. Nevertheless, because we are remanding the case anyway (see section II.C below), we will accommodate our dissenting colleague and direct both counsel to submit a stipulation concerning whether Rush University Hospital, Dr. Barnes, and Dr. Bonomi were within Susan's provider network. If counsel are not able to agree on a conclusive stipulation, the district court should resolve this issue on remand.

[6] We have previously held that, "while there is a duty to provide accurate information under ERISA, negligence in
(continued...)

At the outset, we note Judge Aspen's holding that James first raised one of the two arguments in support of his breach-of-fiduciary-duty claim (namely, the argument that Concert breached its fiduciary duty when its representatives failed to apprise him that Rush University Hospital was not in Susan's network despite James's two phone calls to Concert on April 7, 2006) in his motion for reconsideration. Although Judge Aspen held that James waived this argument because he first raised it in his motion for reconsideration, Judge Aspen also went on to rule on the merits. On appeal, however, Concert did not argue that James had waived the argument, and so it is arguable that Concert has now waived any waiver argument that it might have had. Therefore, we will bypass the waiver issue altogether and will address both of James's arguments only on the merits.

ERISA requires a plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the

----

6  (...continued)

fulfilling that duty is not actionable." *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 642 (7th Cir. 2004). Under this rule, James's claim would likely fail because he has not shown that Concert and Royal Management "purposefully intended to confuse plan participants." *Id.* But we have recently counseled that such "broad statements . . . must not be read *too* broadly; although negligent misrepresentations are not themselves actionable, the failure to take reasonable steps to head off such misrepresentations can be actionable." *Kenseth*, 610 F.3d at 471.

conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). To establish a breach of fiduciary duty, James "must prove (1) that defendants are plan fiduciaries; (2) that defendants breached their fiduciary duties; and (3) that their breach caused some harm to [him]." *Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 639 (7th Cir. 2007) (citations omitted). If James can establish such a claim, he may then avail himself of ERISA's "award of equitable relief . . . to a plan participant suing on h[is] own behalf for breach of fiduciary duty." *Kenseth*, 610 F.3d at 464 (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002)).[7]

Concert and Royal Management have both conceded that they were plan fiduciaries under ERISA. *See* 29 U.S.C.

---

[7] In the past, we have held "that technical violations of ERISA's notification requirements, without a showing of bad faith, active concealment, or detrimental reliance, do not state a cause of action." *Andersen v. Chrysler Corp.*, 99 F.3d 846, 859 (7th Cir. 1996). But in a recent decision, the Supreme Court has stated that ERISA's allowance for equitable remedies may be available in the absence of a fiduciary's malfeasance, or a beneficiary's detrimental reliance. *See Cigna Corporation v. Amara*, 131 S. Ct. 1866 (2011). In *Amara* the Court held that, although the requisite showing of "actual harm may sometimes consist of detrimental reliance, . . . it might also come from the loss of a right protected by ERISA or its trust-law antecedents." *Id.* at 1881. This will undoubtedly change the landscape of our ERISA equitable-remedies case law going forward. We need not discuss the ramifications of *Amara* here, however, because James fails to demonstrate that any breach on the part of Concert and Royal Management actually caused his harm.

§§ 1002(21)(A) (defining a plan fiduciary), 1105(a) (setting forth liability of a co-fiduciary). Additionally, it is evident from the record that the Killians incurred harm, namely, the approximately $80,000 in medical bills owed by Susan's estate. This then leaves us to ponder the questions of whether Concert and Royal Management breached a fiduciary duty owed to Susan, and, if so, whether such a breach caused the harm.

We begin with James's contention that Susan was harmed by Concert and Royal Management's failure to provide an SPD. ERISA expressly requires a plan administrator to furnish an SPD to each plan participant. 29 U.S.C. § 1021(a). Plan administrators must furnish the SPD within 90 days after a participant enrolls in the plan. *Id.* § 1024(b)(1)(A). Among other requirements, SPDs for group health plans like the Royal Plan must include "provisions governing the use of network providers, the composition of the provider network, and whether, and under what circumstances, coverage is provided for out-of-network services . . . ." 29 C.F.R. § 2520.102-3(j)(3); *see also* 29 U.S.C. § 1022 (describing the required disclosures of an SPD). Given these provisions, it is obvious that SPDs play an important role in informing ERISA beneficiaries about their benefits. And as we have noted, "[t]he most important way in which the fiduciary complies with its duty of care is to provide accurate and complete written explanations of the benefits available to plan participants and beneficiaries." *Kenseth*, 610 F.3d at 471. Concert and Royal Management admit that they failed to provide Susan with an SPD and, accordingly, they breached their fiduciary duty to her.

Yet James must still show that this breach of fiduciary duty caused Susan's harm. Concert and Royal Management claim their breach did not harm Susan because she would have sought treatment from Dr. Bonomi, Dr. Barnes, and Rush University Hospital even if she had received an SPD. Clearly Susan made an appointment at Rush University Hospital and with Dr. Bonomi several days before checking in at the hospital on April 7, 2006. Dr. Bonomi referred her to Dr. Barnes who quickly diagnosed a death-threatening brain tumor and operated on her soon thereafter. As noted earlier, James concedes that he and Susan would have sought a second opinion from Dr. Bonomi regardless of whether he was in Susan's network. Further, he concedes that he made the appointment and checked in at Rush University Hospital without first attempting to determine whether that facility was in Susan's network. Based on this record, a reasonable fact finder could only conclude that James and Susan would have sought treatment from the doctors at Rush University Hospital regardless of whether Susan had been issued an SPD. Thus, James has not created a triable issue of fact over whether Concert and Royal Management's failure to provide an SPD caused his harm.

James next argues that he was harmed as a result of his reliance on the two phone conversations he had with Concert representatives on April 7, 2006. Specifically, James contends that the failure of the Concert representatives to tell him that Rush University Hospital was out of Susan's network caused his harm. For the purposes of this appeal, we are assuming that James did not

waive this argument, yet he still cannot succeed on the merits.

The district court concluded that James called Concert only to report that Susan was being admitted to Rush University Hospital—not to confirm coverage. James disputes this conclusion on appeal, pointing to his testimony wherein he avers that he called two different toll-free numbers on Susan's insurance card. Because one of the numbers listed on Susan's card is a number used to determine a provider's network participation, James argues that a fact finder could infer that he called to confirm that Rush University Hospital was a member of Susan's network.

James attempts to bolster his argument by pointing to *Kenseth*, where the plaintiff called his insurance company to confirm coverage before undergoing surgery, was given verbal approval by the company's representative, and yet was subsequently denied coverage. *Kenseth*, 610 F.3d at 459-60. In that case, we stated that, "by supplying participants and beneficiaries with plan documents that are silent or ambiguous on a recurring topic, the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions on that subject." *Id.* at 472. Accordingly, we reversed the district court's grant of summary judgment on the plaintiff's breach-of-fiduciary-duty claim. *Id.* at 483. Here, James asks us to do likewise.

We recognize that a fiduciary's duty to disclose is broad. As we have stated elsewhere, "'once an ERISA beneficiary has requested information from an ERISA

fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, *even if that requires conveying information about which the beneficiary did not specifically inquire*.'" *Kenseth*, 610 F.3d at 466 (emphasis in original) (quoting *Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 845-46 (6th Cir. 2003)). Moreover, "[r]egardless of the precision of his questions, once a beneficiary makes known his predicament, the fiduciary 'is under a duty to communicate . . . all material facts in connection with the transaction which the trustee knows or should know.'" *Id.* at 467 (quoting Restatement (Second) of Trusts § 173, cmt. D (1959)).

Implied in this standard, however, is the requirement that the beneficiary at least put the fiduciary on notice that he is in some sort of "predicament." Thus, regardless of which phone number James actually called, at bottom his claim rests on the substance of his conversations with the Concert representatives on April 7, 2006. Unlike the plaintiff in *Kenseth*, who, as instructed by plan documents, called his insurance company and questioned a customer service representative about whether a particular procedure was covered by his plan, James did not ask Concert's representatives about whether Rush University Hospital was in Susan's network. *Id.* at 477.

As noted above, Susan was admonished by plan documents in her possession to call Concert to confirm that any treatment she received, or health provider that she visited, was covered by her plan. Neither of James's

conversations with the Concert representatives can be construed as seeking such confirmation. James's first conversation was highlighted by the Concert representative's alleged statement to "go ahead with whatever had to be done." But this statement was obviously not an authorization for Susan's admission to Rush University Hospital or for her subsequent treatment. Significantly, at the point the representative made the statement, she did not even know the name of the hospital to which James was referring. And regardless of what the representative might have meant by her statement, it is obvious that James did not take her at her word. As James testified at his deposition regarding that first call, "we never determined anything." That is precisely why James called back later. Thus, if James did not himself believe that the representative's statement was an authorization for Susan's treatment, no reasonable juror could construe the statement as an authorization either.[8]

---

[8] The dissent reflects that James's statement that "we never determined anything" might be construed as something he "has come to realize in the years since this call," that nothing was resolved during the first phone call. (Dissent Op. at 51.) This is something neither we nor a jury can infer. We may not—nor may we allow a jury to—translate Killian's thoughts based on his statement made while testifying at his deposition regarding what he believed at the time he spoke to the first agent on April 7, 2006. Without an express statement that shows that Killian has since come to believe that he and the representative never determined anything, we must accept

(continued...)

James's second conversation with Concert amounted to nothing more than a notification that Susan had been admitted to Rush University Hospital. He did not ask any questions or communicate to the Concert representative what kind of treatment Susan was about to undergo or the doctor or doctors who would provide that treatment. James admits that the statements he made during the second call were brief and that he initiated that conversation by dialing the customer service/utilization review number—not the provider-participation number that he had previously dialed. If James had indicated concern about whether Rush University Hospital was in- or out-of-network, he could have dialed the provider-participation number (as he had done originally) and sought the requisite information from a Concert representative. Or he could have expressed his concern to the second representative he called and she could have switched him to the proper source. He did neither.

James's statements during his short conversations with the Concert representatives do not trigger Concert's fiduciary duty. We would have to significantly embellish the threadbare record before us to allow for a possible finding that James put Concert on notice of his "predicament." The case law simply does not support a blanket requirement that a fiduciary turn every vague exchange,

---

[8] (...continued)

Killian's testimony under oath as conveying what he believed at the time the incident occurred.

such as the phone calls between James and Concert in this case, into a quest to uncover some kind of harm that might befall a beneficiary. Therefore, Concert did not breach its fiduciary duty by failing to apprise him that Susan's treatment at Rush University Hospital was not covered by her plan.

We also note that, at a more fundamental level, James's reliance on *Kenseth* undermines his claim. In that case, we drew a distinction between instances when a fiduciary "supplie[s] participants and beneficiaries with plan documents that are silent or ambiguous on a recurring topic," and instances "when the plan documents are clear and the fiduciary has exercised appropriate oversight over what its agents advise plan participants and beneficiaries as to their rights under those documents." *Id.* at 472. In the former context, "the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions on the subject." *Id.* In the latter context, a fiduciary "will not be held liable simply because a ministerial, non-fiduciary agent has given incomplete or mistaken advice to an insured." *Id.*

This case is an example of an instance where plan documents are clear and the fiduciary has exercised appropriate oversight over its agents. The plan documents clearly and unambiguously state the name of Susan's network. Further, the plan documents are clear on both the necessity of and means by which a beneficiary can determine whether a provider is within his or her network. Our dissenting colleague acknowledges as much. (Dissent Op. at 42-43.) As noted above, Susan's

Employee Benefits Summary, Certificate of Insurance, and insurance card identified her network as the PHCS Open Access network. Although she did not have a provider list, those documents warned Susan that she should seek treatment from her preferred providers "to avoid reduced benefit payments." And the phone numbers on her insurance card gave her instructions on how "[t]o determine [p]rovider participation." Thus, the Killians had available to them clear instructions by which they could have determined whether Dr. Barnes, Dr. Bonomi, or Rush University Hospital were within the PHCS Open Access network.[9]

James has also failed to put forth any evidence that Concert did not properly exercise oversight over its agents. He argues only that the substance of the telephone conversations that he had with the two Concert representatives is sufficient to create an inference that

---

[9] Moreover, Susan's insurance card required her to precertify "[n]on-emergency admissions . . . no less than 7 days prior to admission." Emergency admissions, conversely, "must be certified within 48 hours." The Killians followed neither of these directions, despite clear instruction to the contrary. We express no opinion on whether Susan's treatment was an emergency or a non-emergency because there is no evidence supporting a determination one way or the other. We thus respectfully disagree with our dissenting colleague that "a reasonable trier of fact could conclude that Mr. Killian believed [that Susan's surgery] was an emergency procedure for which he was not required to obtain precertification seven days in advance." (Dissent Op. at 52.)

the two Concert representatives should have alerted him that Rush University Hospital was not in Susan's network. But there is no evidence in the record to suggest that any such failure on the representatives' part was due to a lack of oversight by Concert.

Given these facts, this case is an example of the instance, envisioned in *Kenseth*, "when the plan documents are clear and the fiduciary has exercised appropriate oversight over what its agents advise plan participants and beneficiaries as to their rights under those documents." *Id.* Accordingly, Concert may not be held liable for mistaken or incomplete advice rendered by "ministerial, non-fiduciary agent[s]." *Id.* Here, James did not receive *any* advice during his conversations with the Concert representatives (or at least any advice that caused him to act). To the extent that he is tempted to argue that the first representative's statement to "go ahead with whatever had to be done" overcomes the mistaken-or-incomplete-advice hurdle, we reject that argument because, as we noted above, James himself did not believe that the statement gave him authorization for Susan's subsequent treatments. In short, because this case involved a set of clear, unambiguous plan documents, and James has not shown that he was given any advice, let alone something more than "incomplete or mistaken advice" from a "ministerial, non-fiduciary agent," Concert cannot be held liable for a breach of fiduciary duty.

The failure of Royal Management and Concert to produce an SPD did not cause the Killians' harm. Addition-

ally, we reject James's argument that Concert breached its fiduciary duty by failing to notify him during two phone calls that Rush University Hospital was not in Susan's network because James did not give Concert adequate notice of his predicament. Alternatively, that argument fails because James failed to follow the clear instructions of plan documents and has not shown that he received any advice, let alone mistaken or incomplete advice, from Concert's representatives. Therefore, Concert did not breach its fiduciary duty and the district court properly granted summary judgment on this claim.

## C. Statutory Penalties

ERISA requires a plan administrator to, "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Further, ERISA requires an administrator to comply with such a request within 30 days or face statutory penalties. *Id.* § 1132(c)(1)(B). The penalty may be as much as $110 for each day that the plan administrator fails to produce the requested documentation. 29 C.F.R. § 2575.502c-1. Yet the decision of whether to impose a statutory penalty and the amount by which an administrator should be penalized is left to the discretion of the district court. 29 U.S.C. § 1132(c)(1)(B); *Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 759-60 (7th Cir. 1999)

("Fines under § 1132(c)(1) are not mandatory, even if there has been a [statutory] violation. . . ."). As noted above, we review an award of statutory penalties for an abuse of discretion. *Fenster*, 301 F.3d at 858.

From the outset, James has maintained that Royal Management has never provided Susan with an SPD or a list of network providers. Moreover, James did not have access to a copy of Susan's group policy. Therefore, on April 24, 2008—during the course of litigation—James's attorney made a formal request to Royal Management to produce, *inter alia*, an SPD and a copy of any health plan of which Susan was a member.[10] In response to James's production request, on May 5, 2008, Royal Management produced a copy of the Certificate of Insurance and the Employee Benefits Summary. James believed that these productions did not satisfy the definition of an SPD and a group policy plan and, therefore, that Royal Management failed to produce the documentation he had requested within the ERISA-mandated 30 days. Accordingly, on March 2, 2009, he filed his second amended complaint that added a statutory-penalties claim seeking an award of $110 per day "for the failure to provide a [SPD] or other plan documents . . . ." Eventually, on January 7, 2010, Royal Management produced a copy of the group policy but, to date, it has never produced an SPD.

---

[10] Royal Management does not dispute that both an SPD and a copy of a health plan are the types of documents that a plan administrator is required to provide on request under § 1024(b)(4).

The district court consistently noted that James's claim for statutory penalties involved two separate grounds: (1) Royal Management's alleged failure to produce an SPD; and (2) Royal Management's alleged failure to produce a copy of the group policy. Indeed, in denying Royal Management's motion to dismiss James's statutory-penalties claim, the district court (with Judge Aspen presiding) noted that James's claim rested on Royal Management's alleged failure to produce both an SPD and a copy of the group policy. Later, after Royal Management and Concert had moved for summary judgment on all of James's claims, the district court specifically rejected Royal Management's argument that its production of the Certificate of Insurance and the Employee Benefits Summary satisfied James's request for an SPD. Accordingly, the district court held that Royal Management had violated 29 U.S.C. § 1024(b)(4)'s requirement to produce an SPD. The district court also acknowledged that, although the parties did not brief the issue, James had put forth a second statutory-penalties claim based on Royal Management's alleged failure to produce a copy of the group policy. Thus, the district court ordered supplemental briefing on the issue of whether statutory penalties should be awarded (1) for Royal Management's failure to produce an SPD, and (2) for Royal Management's alleged failure to produce a copy of the group policy.

Although James moved the district court to reconsider its summary judgment order, he did not file a motion for statutory penalties by the court's supplemental briefing deadline. Royal Management, however, filed a

Memorandum in Opposition to the Imposition of Any Statutory Penalties by its deadline. In that brief, Royal Management addressed only its alleged failure to produce an SPD—it did not discuss its alleged failure to produce a copy of the group policy.[11] After Royal Management filed its brief, James filed a Motion for Leave to File Brief Instanter, arguing that he should be allowed to submit a brief in support of his statutory-penalties claims. The district court granted the motion. James's brief, filed on August 3, 2010, included arguments for statutory penalties based on both Royal Management's failure to produce an SPD and its failure to produce a copy of the group policy.

Shortly after James had filed his brief in support of his statutory-penalties claims, this case was transferred to Judge Gary S. Feinerman. On December 17, 2010, Judge Feinerman issued an order awarding James statutory damages based on Royal Management's failure to produce an SPD. That order only addressed James's argument that he was entitled to statutory damages because of Royal Management's failure to produce an SPD; it said nothing

---

[11] On appeal, Royal Management advances the curious argument that James never moved for penalties on the basis of Royal Management's failure to produce a copy of the group policy and, therefore, he has waived that issue. This is simply inaccurate; James has consistently maintained two claims for statutory penalties throughout this litigation. That Royal Management addressed only one of James's claims in its opposition brief below does not affect James's ability to appeal the district court's decision on his other claim.

about James's claim based on Royal Management's failure to produce a copy of the group policy. Ultimately, Judge Feinerman assessed statutory damages in the amount of $10 per day for 588 days—from May 28, 2009 (the thirty-first day after April 28, 2008, the presumed date of James's request for an SPD), to January 7, 2010 (James's suggested end date).

There are several issues with this formula. First, the use of April 28, 2008, as the date of James's request for an SPD does not comport with the record. We believe that the record clearly shows the actual request date to be April 24, 2008, and therefore, on remand, the district court should begin its calculations using that date. Second, the district court used January 7, 2010, as the end date because that is the date James had "suggested." But that date is based on an imprecise reading of James's arguments. James has consistently argued—including in his supplemental brief in support of his statutory-penalties claims—that he seeks statutory damages on the basis of both Royal Management's alleged failure to produce an SPD and on its failure to produce a copy of the group policy. Thus, James argued, he was due two separate penalty awards: the first, based on the failure to produce a copy of the group policy, from the thirty-first day after his April 24, 2008, request, to January 7, 2010, the date Royal Management produced the group policy; the second, based on the failure to produce an SPD, from the thirty-first day after his April 24, 2008, request, to the date Judge Feinerman's order was issued because Royal Management never produced an SPD. The district court thus improperly calculated the end date by conflating the

two claims and tying James's January 7, 2010, requested end date for the group-policy claim to James's SPD claim.

Third, and finally, the district court did not mention James's statutory-penalties claim based on Royal Management's alleged failure to provide a copy of the group policy. As we noted above, the district court has discretion in the first instance to decide whether to assess statutory penalties for a particular infraction at all and, if so, how much to assess. But the district court may not overlook a party's statutory-penalties claim that has been made consistently throughout the course of litigation. We have held that a district court abuses its discretion when it fails to consider an essential factor. *Powell v. AT&T Commc'ns, Inc.*, 938 F.2d 823, 825 (7th Cir. 1991). The district court failed to consider an essential factor by overlooking one of James's statutory-penalties claims; therefore, we remand for further consideration and recalculation.

## III.

James Killian failed to demonstrate that Concert's decision to deny Susan benefits for costs incurred out-of-network was not rationally related to the record. Further, although there is no list of network providers in the record, the district court did not err in refusing to remand the case for a determination of whether Rush University Hospital, Dr. Bonomi, and Dr. Barnes were in Susan's network because doing so would have been a useless formality. Nevertheless, because we are remanding this case anyway, we direct both counsel to submit a stipula-

tion concerning whether Rush University Hospital, Dr. Barnes, and Dr. Bonomi were within Susan's provider network. If counsel are not able to agree on a conclusive stipulation, the district court should resolve this issue on remand.

James also failed to show that Royal Management and Concert caused his harm when they breached their fiduciary duty by failing to provide him and Susan with an SPD. Further, we reject James's argument that Concert breached its fiduciary duty by failing to inform him that Susan's treatment at Rush University Hospital was out-of-network because James did not provide Concert's representatives with adequate notice that he was concerned about the providers' network status. Alternatively, because James and Susan failed to follow clear instructions contained in the plan documents and because James has not shown that he received any advice, let alone mistaken or incomplete advice from the Concert representatives, Concert may not be held liable for a breach of fiduciary duty. Therefore, the district court properly granted summary judgment in favor of Royal Management and Concert on James's denial-of-benefits and breach-of-fiduciary-duty claims.

Because the district court improperly conflated James's statutory-penalties claims and failed to address one of his arguments, however, we reverse its grant of summary judgment against Royal Management and remand for further proceedings. We will not vacate the $5,880 already awarded by the district court and paid to James by Royal Management; rather, we leave it to the district

court to take that award into account when conducting its analysis and recalculation on remand. We express no opinion on the appropriate sanction, if any. For these reasons, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

RIPPLE, *Circuit Judge*, concurring in part and dissenting in part. I join the majority's resolution of Mr. Killian's claim for statutory penalties, but I am unable to join the majority's resolution of the remaining claims. Therefore, with great respect for the opinion of my colleagues, I concur in part and dissent in part.

### A.

Mr. Killian claims that Mrs. Killian was entitled to benefits under the Royal Management Corporation Health Insurance Plan (the "Plan"). As the majority explains, we review a fiduciary's decision to deny benefits under the abuse of discretion standard where, as here, the plan documents give the "fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). We have equated this standard with arbitrary-and-capricious

review. *Jackman Fin. Corp. v. Humana Ins. Co.*, 641 F.3d 860, 864 (7th Cir. 2011). A fiduciary abuses its discretion if its determination lacks "rational support in the record." *Carter v. Pension Plan of A. Finkl & Sons Co. for Eligible Office Emps.*, 654 F.3d 719, 725 (7th Cir. 2011).

Mr. Killian argues that Concert Health Plan Insurance Company ("CHPIC"), the Plan's administrator for claims determinations and its ERISA claims review fiduciary, abused its discretion in two ways. He first asserts that CHPIC abused its discretion by determining that Mrs. Killian belonged to the PHCS Open Access network. He then claims that there is no rational support in the record for CHPIC's conclusion that Mrs. Killian's providers were out-of-network, no matter how we characterize the network to which Mrs. Killian belonged.[1]

---

[1] As the majority explains, the district court did not address this later claim because it did not understand Mr. Killian to be "argu[ing] that CHPIC's decision was arbitrary or capricious on its merits." R.289 at 14 n.15. However, in opposing CHPIC's first motion for summary judgment, Mr. Killian argued that CHPIC "has not presented any admissible evidence to support" its assertion that Mrs. Killian's providers were not in the PHCS Open Access network. R.86 at 12 (emphasis in original). He raised the same contention in opposition to CHPIC's second motion for summary judgment. *See* R.263 at 8-9 ("CHPIC has submitted no evidence that Rush University, for example, is not part of the . . . PHCS (Open Access) network . . . ."). He reiterated this point in his motion for reconsideration. R.290 at 9. It is therefore clear that Mr. Killian raised this claim adequately.

I agree with my colleagues that CHPIC did not abuse its discretion in concluding that Mrs. Killian belonged to the PHCS Open Access network, and I join the majority's analysis of that issue without reservation. However, I cannot agree with the majority's determination that there was rational support in the record for CHPIC's determination that the providers in question were out-of-network. The majority acknowledges that there is *no* evidence in the record indicating whether these providers were part of the PHCS Open Access network. It follows that there is no rational support—indeed, there is not any support—in the record for CHPIC's conclusion that the providers were out of Mrs. Killian's network. We simply lack the record evidence necessary to address the question. I therefore favor remanding the issue to the district court so that CHPIC might supplement the record with the evidence it relied upon in concluding that the providers were out-of-network. CHPIC itself has consented to such a remand. *See* CHPIC Br. 12. I see no reason why we should not take it up on this offer.

Although my colleagues question whether such a remand is necessary, they permit one to accommodate my views. I am grateful for this accommodation and, in the remainder of this section, shall set forth the reason why I believe such a remand is appropriate.

The majority takes the view that we need not remand this claim because doing so would be a "useless formality." *See Schleibaum v. Kmart Corp.*, 153 F.3d 496, 503 (7th Cir. 1998). I do not believe this principle has any

application to the issue at hand. When the adequacy of an administrator's denial letter is at issue, *see* 29 U.S.C. § 1133, the only remedy generally available is a remand to the administrator for a more substantial explanation. *Schleibaum*, 153 F.3d at 503. Such a remand is not required, however, if it would be a "useless formality." *Id.* Here, the issue is not whether CHPIC adequately informed Mr. Killian of its reasons for denying Mrs. Killian's claim, but whether CHPIC's underlying factual determination has rational support in the record.[2] Mr. Killian does not contend that CHPIC failed to include certain required information in its denial letter; rather, he seeks a determination that the decision itself was arbitrary and capricious and that he is therefore entitled to benefits under 29 U.S.C. § 1132(a)(1)(B).[3]

This distinction is significant. ERISA's specific notification requirements are designed to ensure that any benefi-

---

[2] Although Mr. Killian did challenge the adequacy of CHPIC's denial letters in the district court, summary judgment was entered in favor of CHPIC on this claim. R.289 at 14-21. Mr. Killian has not appealed this determination, and it is accordingly not before us.

[3] The majority relies on Mr. Killian's counsel's statement that he "suspected" that CHPIC would determine that the providers were out-of-network, if the matter were remanded to it. Even if ERISA required that the matter be remanded to CHPIC for further explanation, and even if CHPIC determined that the providers were out-of-network, as Mr. Killian's counsel suspects it would, Mr. Killian then would be entitled to challenge that determination as an abuse of discretion and to seek benefits under 29 U.S.C. § 1132(a)(1)(B).

ciary whose claim is denied has "an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial" in further administrative proceedings and in federal court. *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992). Mr. Killian now seeks judicial review of CHPIC's substantive determination. That review focuses on whether CHPIC had some rational support for its conclusion. If the matter is as simple as CHPIC suggests, the district court should be able to resolve this issue with ease on remand.

## B.

Mr. Killian also submits that Royal Management Corporation ("RMC") and CHPIC breached their fiduciary duties by failing to provide Mrs. Killian with a summary plan description ("SPD") and by failing to inform him that Mrs. Killian's providers were out-of-network during telephone conversations on April 7, 2006, respectively. While I rely on reasons different from those articulated by my colleagues, I agree that summary judgment was appropriate on the SPD issue. I believe, however, that we must remand the issue of the adequacy of CHPIC's information on the status of Mrs. Killian's providers. I shall discuss each of these issues in the following subsections.

## 1.

CHPIC and RMC are both fiduciaries under ERISA. Consequently, in fulfilling their duties to Mrs. Killian and other plan participants they must

discharge [their] duties . . . solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(1)(B). These duties are analogous to those of loyalty and care that are imposed upon a trustee under the common law. *See Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466 (7th Cir. 2010). A beneficiary is entitled to relief for a breach of fiduciary duty if he proves "(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." *Id.* at 464.

## 2.

Mr. Killian claims that RMC breached its fiduciary duty to Mrs. Killian by failing to provide her with an SPD, as required by 29 U.S.C. § 1021.[4] By regulation, each SPD must contain "a description of . . . the composition of the provider network." 29 C.F.R. § 2520.102-3(j)(3). We have explained that a fiduciary breaches its duty if it "fails to make the types of disclosures expressly

---

[4] The record indicates that RMC was the Plan's administrator. R.259-3 at 77. This designation brings with it the obligation of furnishing an SPD to the Plan's participants. *See* 29 U.S.C. § 1021(a).

required by the statute." *Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781, 808 (7th Cir. 2009). The district court determined properly that Mrs. Killian never received an ERISA-compliant SPD. I therefore agree with the majority's conclusion that RMC breached its fiduciary duty to Mrs. Killian in this regard. I also agree that the record does not support a conclusion that the Killians were harmed by this failure. However, my analysis of the causation question differs from that of the majority.

The majority concludes that RMC's failure to produce an SPD did not harm Mrs. Killian by relying heavily on Mr. Killian's testimony that his wife would have sought a second opinion from Dr. Bonami "no matter what." R.253 at 138-39. The Killians' admission would preclude them from arguing that the absence of an SPD caused them to seek a second opinion from an out-of-network provider because they admitted that they would do so regardless of the physicians' network status. However, a reasonable trier of fact still could conclude that Mrs. Killian would not have acquiesced to costly surgery by the providers if she had known that the providers were not in her network. Indeed, as I shall explain in further detail below, a reasonable trier of fact could conclude that Mr. Killian attempted to determine the surgery providers' network status shortly after learning that his wife required this prompt brain surgery. That Mrs. Killian was admitted to the hospital for this unexpected procedure before Mr. Killian contacted CHPIC does not preclude the distinct possibility that Mrs. Killian would have considered having another

provider perform this unexpected surgery once she and Mr. Killian had been informed adequately that the contemplated providers were outside the network. Notably, Mr. Killian called the insurance company before the surgery, indicating that the Killians were concerned about whether the surgery would be covered by Mrs. Killian's insurance. Consequently, I cannot join the majority's analysis on this point.

I nevertheless believe that the majority's result on this point should be sustained. Mr. Killian asserts that his wife incurred nearly $80,000 in out-of-network medical bills because RMC failed to provide Mrs. Killian with an SPD, which would have provided her with information about how she could ascertain that a certain provider was within the network. The record does not support this assertion. Mrs. Killian's insurance card stated that she should call a specific number "to determine Provider participation." R.82-7 at 2. Mr. Killian knew that he could call this number to determine a provider's network status before Mrs. Killian became ill. R.253 at 31-32. Furthermore, Mrs. Killian received an "Enrollment Package" instructing her in multiple places to call the same number that was listed on her insurance card to ensure that a provider is in-network. *See* R.259-5 at 8 ("Please always confirm with the network that the provider is still participating at the location you have chosen."); *id.* at 10 ("The most **accurate, up to date information** can be found by calling the CHP dedicated

line . . . ." (emphasis in original)).[5] There is, therefore, no evidence that Mrs. Killian incurred these medical bills because she did not know how to determine whether they were in her network.

### 3.

Mr. Killian also claims that CHPIC breached its fiduciary duty to Mrs. Killian when it failed to inform him that the providers at Rush University Medical Center ("Rush") were out of Mrs. Killian's network during two phone calls on April 7, 2006. The majority opinion suggests that Mr. Killian may have waived this claim and then rejects the claim on the merits. In my view, CHPIC has waived this possible waiver, and Mr. Killian is entitled to further consideration of this claim before the district court.

### a.

The majority notes that Mr. Killian may have waived any argument premised on these phone calls by failing to raise the issue in opposition to CHPIC's motion for summary judgment. I agree that Mr. Killian's responsive memorandum contains no discussion of this claim.

---

[5] Madonna Corbett, RMC's Human Resources Director, explained that RMC's business practice was to provide new enrollees in the Plan with this information. *See* R.259-2.

*See* R.263.[6]

Ordinarily, a litigant who fails to raise an argument in opposition to a properly raised motion for summary judgment will not be permitted to raise that same argument thereafter, either in a motion for reconsideration or on appeal. *See Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985). However, a party waives the waiver by failing to assert it in this

---

[6] Mr. Killian's complaint does contain sufficient allegations to put CHPIC on notice of the claim. For instance, Mr. Killian alleged that he

> called Concert Health Plan Insurance Company to confirm that Rush University was a network provider under the Concert Health Plan (or Royal Management Corp. Health Insurance Plan). Concert Health Plan Insurance Company informed Killian that Rush University was in the Concert Health Plan network or failed to inform Killian Rush University was not in the Concert Health Plan network. Killian relied on these statements or omissions . . . .

R.134 at 10 (setting out RMC's alleged breaches of fiduciary duty); *see also id.* at 12 (incorporating this allegation against CHPIC). The complaint does not spell out how CHPIC violated ERISA in these phone calls. However, a plaintiff need not plead legal theories. *Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 283 n.2 (7th Cir. 2011). Mr. Killian elaborated upon this claim in his motion for reconsideration. *See* R.290 at 1-5.

court.[7] That circumstance is present in this case. In its appellate brief, CHPIC asserts that Mr. Killian waived various arguments by not raising them before the district court.[8] It says nothing, however, about Mr. Killian waiving this particular argument. Instead, CHPIC argues that "[n]o efforts were made by Plaintiff or his wife to confirm whether any of these providers or treaters were within the network." CHPIC Br. 10. It further claims that "nothing that [it] did or said in furnishing the information caused specific harm to the Plaintiff." *Id.* By addressing the merits of this claim and failing to assert the possible waiver, CHPIC has waived Mr. Killian's possible waiver.

The closest CHPIC comes to asserting this possible waiver on appeal is in the portion of its brief titled "*Issues Presented for Review*," where it states: "It is unclear specifically how Plaintiff can present the issues presented in his appellate brief, as the issues presented in his appeal

---

[7] *See, e.g., Westefer v. Snyder*, 422 F.3d 570, 584 n.20 (7th Cir. 2005); *Riemer v. Illinois Dep't of Transp.*, 148 F.3d 800, 804-05 n.4 (7th Cir. 1998).

[8] CHPIC contends that Mr. Killian waived any argument that CHPIC's benefit determination was not supported by rational support in the record. CHPIC Br. 11; *accord id.* at 13. Although CHPIC incorporates RMC's arguments on the fiduciary duty claims by reference, *see id.* at 13, RMC similarly fails to raise the waiver noted by the majority. (While RMC does assert that Mr. Killian waived certain aspects of his statutory-penalties claim, RMC Br. 11, it says nothing about the waiver at issue.)

were never developed or argued at the District Court level." CHPIC Br. 1-2. This statement is insufficient to raise the waiver point for several reasons. First, it appears only in the brief's statement of the issues, not in the section devoted to legal analysis. *See Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 795 (7th Cir. 1989) (holding that an argument raised in one sentence of a brief's summary of argument with no citation to the record or the governing law is waived); *see also Am. Int'l Enters., Inc. v. FDIC*, 3 F.3d 1263, 1266 n.5 (9th Cir. 1993) (holding arguments raised only in a "Statement of Issues" are waived); *cf. United States v. Kumpf*, 483 F.3d 785, 791 (7th Cir. 2006) (explaining that a party does not raise adequately an issue on appeal by merely listing it in the statement of issues). Even if CHPIC could raise adequately an argument by listing it in the issue statement, it cannot do so with a one-sentence statement devoid of any citation to the record or governing law. *See Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011); *Perry v. Sullivan*, 207 F.3d 379, 383 (7th Cir. 2000).[9] For these reasons, I believe that it is appropriate to

---

[9] Finally, to the extent CHPIC was referencing this precise waiver with its general statement, its argument is built upon a flawed premise. Although Mr. Killian may have raised this claim *inadequately* in the district court, it is incorrect to claim that this issue "w[as] *never* developed or argued at the District Court level." CHPIC Br. 1-2 (emphasis added). As explained above, Mr. Killian described the factual basis for the claim in his complaint and called it to the district court's attention in his motion for reconsideration.

address the merits of this claim despite the possible waiver.

### b.

With respect to the merits of this argument, we have recognized that "'once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, *even if that requires conveying information about which the beneficiary did not specifically inquire.*'" *Kenseth*, 610 F.3d at 466 (alteration omitted) (emphasis in original) (quoting *Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 845-46 (6th Cir. 2003)). "Regardless of the precision of his questions, once a beneficiary makes known his predicament, the fiduciary is 'under a duty to communicate . . . all material facts in connection with the transaction which the trustee knows or should know.'" *Id.* at 467 (alteration in original) (quoting Restatement (Second) of Trusts § 173, cmt. d (1959)). If a fiduciary "suppl[ies] participants and beneficiaries with plan documents that are silent or ambiguous on a recurring topic, the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions on that subject." *Id.* at 472. If, however, "the plan documents are clear and the fiduciary has exercised appropriate oversight over what its agents advise plan participants and beneficiaries, the fiduciary will not be held liable

simply because a ministerial, non-fiduciary agent has given incomplete or mistaken advice to an insured." *Id.*

### i.

My colleagues conclude that the plan documents were clear. However, the Master Group Policy did not set out which providers were in the PHCS Open Access network. Instead, beneficiaries were instructed to "call the number listed on the back of [their] medical identification card[s]" to determine whether a provider was in-network. R.259-3 at 15. This is much like *Kenseth*, where "[t]he one and only course of action [the policy documents] advised the reader in terms of seeking additional information as to whether a particular course of treatment was covered by the [relevant] plan was to call [the fiduciary]'s customer service line." 610 F.3d at 477. The majority reasons that because the Master Group Policy provided "clear instructions by which [the Killians] could have determined whether [the providers] were within the PHCS Open Access network," the plan documents were sufficiently clear. Majority Op. 26. *Kenseth*, however, makes clear that a fiduciary cannot satisfy its broad fiduciary duty of disclosure solely by instructing beneficiaries to call and ask for the material information they are seeking. *See* 610 F.3d at 479.

Here, "[t]he [Master Group Policy] encouraged participants to contact [CHPIC] before undergoing treatment to determine whether the treatment would be [in-network], and that is exactly what [Mr. Killian] did." *Id.* at 477.

I would therefore conclude that CHPIC "expose[d] itself to liability for the mistakes that [its] representatives might make in answering [Mr. Killian's] questions on that subject." *Id.* at 472.

### ii.

I further believe that a reasonable trier of fact could conclude that CHPIC was aware (or, at the very least, that it should have been aware) that Mr. Killian was attempting to determine whether the physicians who were about to perform surgery on Mrs. Killian at Rush were within Mrs. Killian's network. The front of Mrs. Killian's insurance card provides two phone numbers. The first of the two numbers is for "determin[ing] Provider participation." R.82-7 at 2. This was a "dedicated line" for providing "[t]he most **accurate, up to date information**" regarding provider participation. R.259-5 at 10 (emphasis in original). Because this line was dedicated to informing beneficiaries whether providers were in-network, CHPIC knew (or, at the very least, should have known) that beneficiaries would call this line to determine a provider's network status. Mr. Killian called this number on April 7, 2006. After providing Mrs. Killian's name and card number, he said, "we are here for a second opinion and she is going—they want to admit her because we already determined the tumor has to come off." R.253 at 72; *see also id.* at 125 ("I said she was being admitted to the hospital and they were going to do the [brain] surgery."). Mr. Killian referred to Rush as "St. Luke's," the name that he had always

used for this hospital. *Id*. at 72.[10] The CHPIC representative said that she was unable to find a listing under that name and instructed Mr. Killian to "[g]ive [her] a call back." *Id*. She also said that Mrs. Killian should "go ahead with whatever had to be done." *Id.* at 125. Although the representative did not directly state that Rush was in Mrs. Killian's network, a reasonable trier of fact could conclude that this representative failed "'to convey complete and accurate information material to [Mrs. Killian]'s circumstance.'" *See Kenseth*, 610 F.3d at 466 (citation omitted). My colleagues rely heavily on Mr. Killian's testimony that he and the agent "never determined anything" during this phone call in concluding that Mr. Killian "did not take her at her word." Majority Op. 23. However, Mr. Killian also testified that he believed that Mrs. Killian's surgery would be covered "[b]ecause nobody ever said these are out-of-network." R.253 at 136. Taking these facts in the light most favorable to Mr. Killian for purposes of summary judgment, a reasonable trier of fact could conclude: (1) that Mr. Killian was concerned about whether the providers were in-network; (2) that Mr. Killian called the number that Mrs. Killian's insurance card said should be used to determine provider participation to resolve this question; (3) that the operator knew that Mr. Killian was

---

[10] Rush University Medical Center adopted its current name in 2003. *See History*, Chicago Hospital Jobs at Rush University Medical Center, http://www.jobsatrush.com/history.htm (last visited Apr. 12, 2012). Before that, Rush's name incorporated the name of a predecessor entity, St. Luke's. *Id.*

seeking this information; (4) that the operator told Mr. Killian to "go ahead with whatever had to be done," even though she knew that she had not been able to establish the provider's network status; and (5) that Mr. Killian left that phone call believing that Mrs. Killian could "go ahead" with whatever had to be done because he had followed the instructions on Mrs. Killian's insurance card, was told to do so and received no warning that the "go ahead" was not to be understood as an authorization.

Although the testimony upon which the majority relies might be read to suggest that Mr. Killian has come to realize in the years since this call occurred that the agent had not definitively authorized the treatment, the remainder of Mr. Killian's testimony suggests that, during the stress of the moment, he believed that he could rely on the agent's representation to "go ahead." Mr. Killian "should not be penalized because he failed to comprehend the technical difference between '[go ahead]' and '[the provider is in-network].' The same ignorance that precipitates the need for answers often limits the ability to ask precisely the right questions." *Kenseth*, 610 F.3d at 467 (internal quotation marks omitted). At the very least, the agent should have instructed Mr. Killian that she was unable to locate an entry in her system for "St. Luke's" and that she could make no representations at that time as to whether the provider was in-network.

The majority also reasons that Mr. Killian could not have relied on this instruction to "go ahead" because he

later called the second number. However, Mr. Killian testified that, in making the second call, he was calling "for preadmission," as he was instructed to by Mrs. Killian's insurance card. R.253 at 74. The card said that "[e]mergency admissions must be certified within 48 hours" and that this second number should be used to obtain the necessary "UTILIZATION REVIEW." R.82-7 at 3. Taking these facts in the light most favorable to Mr. Killian, a reasonable trier of fact could conclude that Mr. Killian made the second call to obtain the required "certification," or "UTILIZATION REVIEW," for his wife's surgery. Having just learned that the surgical procedure was necessary for his wife to live longer than a few days, R.253 at 127-28, a reasonable trier of fact could conclude that Mr. Killian believed this was an emergency procedure for which he was not required to obtain precertification seven days in advance.[11]

When Mr. Killian made this second call, he dialed the second of two numbers on the front of Mrs. Killian's

---

[11] I do not suggest that Mrs. Killian's surgery was in fact an "emergency" for purposes of the policy. The parties have not addressed this point, and its resolution is therefore unnecessary at this stage. Nevertheless, some discussion of the issue is necessary for two reasons. First, it is important to determining what a rational trier of fact could make of Mr. Killian's phone calls on April 7, 2006. Second, the majority opinion appears to conclude that the Killians did not follow the precertification instructions on Mrs. Killian's insurance card. *See* Majority Op. 26 n.9. As my discussion of the point reveals, however, this conclusion is not compelled by the record.

insurance card, which was for customer service. As I have noted earlier, this was the same number that the instructions on the back of the card said should be used to certify admission. Thus, Mr. Killian did not "call [the first representative] back," as she had instructed. However, at the summary judgment stage, Mr. Killian's decision to call a different number is not fatal to his claim. There is evidence that CHPIC had encouraged beneficiaries to use *this* number for determining provider participation, as well. Specifically, in the Master Group Policy, CHPIC instructed beneficiaries that they "must call the number listed on the *back* of [their] medical identification card" in order "[t]o confirm that [a] . . . provider is a CURRENT participant in [the beneficiary's] provider Network." R.259-3 at 15 (emphasis added). The back of Mrs. Killian's insurance card provides two different phone numbers: the customer service number from the front of the card is provided twice; a vision benefits number is provided once. *See* R.82-7 at 3. Therefore, CHPIC should have known that beneficiaries such as Mr. Killian would be calling this line to determine whether certain providers were in their network.

Moreover, the second number that Mr. Killian called was the correct and apparently the only number that he could call to obtain the required certification review with respect to the particular surgical procedure that his wife was about to undergo. Given his earlier telephone conversation, a reasonable trier of fact certainly could conclude that any further information as to whether the providers were in Mrs. Killian's network would

have been provided in the course of this conversation on authorizing the particular procedure.

Indeed, under these circumstances, CHPIC had an affirmative obligation to inform Mr. Killian that the providers Mrs. Killian was about to see were out-of-network. *See Kenseth*, 610 F.3d at 466 ("[T]he trustee 'is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person.'" (citation omitted)). On this record, a rational trier of fact could conclude that this second operator was aware that Mr. Killian's phone calls were an effort to confirm two points: (1) that the health care providers treating his wife were within the Plan's network; and (2) that the particular procedures contemplated for her care were authorized by the Plan. In this second call, Mr. Killian stated: "I'm trying to get confirmation that we are going to be—my wife is going to be admitted to Rush." R.253 at 73. The representative laughed and said, "Oh, you mean St. Luke's," as if she were speaking to a person sitting next to her. *Id.* The second representative then informed Mr. Killian that the hospital is known as "Rush Presbyterian." *Id.* At some point, Mr. Killian said that "Susan is going to be admitted," and the representative said "[o]kay." *Id.* From her laughter and attempt at humor, a reasonable finder of fact well might conclude that this second representative knew something about Mr. Killian's prior call. It would be reasonable to infer that this representative knew that Mr. Killian had attempted to determine

whether "St. Luke's" was in Mrs. Killian's network in a prior call to the number for determining provider participation.

The majority asserts that ERISA does not require a fiduciary to set about on a "quest to uncover some kind of harm that might befall a beneficiary." Majority Op. 25. This statement, however true as a general principle, hardly characterizes fairly this case. Given the broad fiduciary duties imposed by ERISA, an insurance company cannot defeat, as a matter of law, a breach-of-fiduciary-duty claim by asserting that it was unaware that an insured was seeking certain material plan information when, as in the circumstances presented here, the insured calls two different numbers that the insurance company itself established to provide the sort of information in question. This is particularly true when the representatives tell an insured to "go ahead with whatever ha[s] to be done" while knowing (or at least having reason to know) that the insured is confused about this aspect of his plan and is about to undergo a costly procedure that will not be fully covered.

The majority points out that "there is no evidence in the record to suggest that any . . . failure on the representatives' part was due to a lack of oversight by Concert." Majority Op. 27. Assuming, arguendo, the truth of this assertion, I do not believe this conclusion entitles CHPIC to summary judgment at this stage. We have affirmed an entry of judgment against a plan administrator where the "plan documents . . . failed to explain adequately" a particular provision and the lack

of clarity "was then exacerbated by [the fiduciary's agents] when [the beneficiary] inquired about her coverage." *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 591 (7th Cir. 2000). In *Kenseth*, we read *Bowerman* to establish that "by supplying participants and beneficiaries with plan documents that are silent or ambiguous on a recurring topic, the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions on that subject." 610 F.3d at 472 (citing *Bowerman*, 226 F.3d at 591)*. Kenseth* further indicated that the principle emerging from *Bowerman* is "*especially true* when the fiduciary has not taken appropriate steps to make sure that ministerial employees will provide an insured with the complete and accurate information that is missing from the plan documents themselves." *Id.* at 472 (emphasis added).

Regardless, CHPIC has not yet satisfied its initial burden on summary judgment of "show[ing] that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), as to the appropriateness of the steps it took to make sure that its ministerial employees provided insureds with the complete and accurate information that cannot be found in the plan documents themselves. If it ever does, Mr. Killian then would have the burden of coming forward with evidence to create a genuine fact issue on this point.[12]

---

[12] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Of course, a party seeking summary judgment always bears the

(continued...)

### iii.

If a beneficiary establishes that a fiduciary has breached its duty, ERISA authorizes injunctions and "other equitable relief." *See* 29 U.S.C. § 1132(a)(3); *Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 283 (7th Cir. 2011). When reversing summary judgments, we frequently remand the actions to the district court so that the parties can give more attention to the remedial question.[13] That

---

[12] (...continued)
initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996) ("Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial."). Of course, in an ordinary case, we would hold that a litigant in Mr. Killian's position waived this legal argument by failing to articulate it once CHPIC moved for summary judgment. *See Teumer v. Gen. Motors Corp.*, 34 F.3d 542, 546 (7th Cir. 1994). As explained above, however, CHPIC has failed to avail itself of the protections of our waiver rule. I would therefore conclude that this claim is alive and that the burden to establish a genuine issue of material fact on this point has yet to be placed properly upon Mr. Killian.

[13] *See, e.g., Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 483 (7th Cir. 2010) (remanding where the plaintiff "may be able

(continued...)

approach is particularly appropriate here. I would there-
fore remand this claim to the district court in order to
afford Mr. Killian the opportunity to explain in greater
detail why he believes he is entitled to equitable relief
under § 1132(a)(3).

**iv.**

Today's decision will have a significant impact on two
levels. To the plaintiff, it deprives him of the protection
of a federal statute designed specifically to ensure that
benefits plan fiduciaries take the steps they would take
if their own economic welfare was at stake. No reason-
able plan fiduciary can maintain that he would have
allowed himself to be treated as Mr. Killian maintains
that he and his wife were treated during a time of
great medical need. On a broader level, today's holding
suggests a departure from our long-standing view
that ERISA's incorporation of common law fiduciary
standards brings to federal benefits law the high degree
of loyalty and care by which those ancient fiduciary
principles have protected countless generations of English
and American trust beneficiaries. *See Kenseth*, 610 F.3d at
466 ("This duty of course includes an obligation not
to mislead a plan participant or to misrepresent the
terms or administration of an employee benefit plan,
including an insurance plan. But the duty is not limited

---

[13] (...continued)
to identify a form of equitable relief that is appropriate to
the facts of this case").

to that negative command. It includes an affirmative obligation to communicate material facts affecting the interests of beneficiaries. This duty exists when a beneficiary asks fiduciaries for information, and even when he or she does not." (citations omitted) (internal quotation marks omitted)); *see also Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993) ("Th[e] duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform but also an affirmative duty to inform when the trustee knows that silence might be harmful."). Because I believe that today's decision frustrates the manifest intent of Congress that Americans have such protection, I respectfully dissent from this part of the court's holding.

## Conclusion

For the foregoing reasons, I concur in part and dissent in part.